492 So.2d 550 (1986)
Em W. KNIPMEYER, Plaintiff-Appellee,
v.
DIOCESE OF ALEXANDRIA, Defendant-Appellant.
No. 85-210.
Court of Appeal of Louisiana, Third Circuit.
July 23, 1986.
Writ Denied November 7, 1986.
*551 Provosty, Sadler & Delaunay, Albin A. Provosty, Jr., Alexandria, for defendant-appellant.
Wright & Wright, R. Stuart Wright, Natchitoches, for plaintiff-appellee.
Before STOKER, DOUCET, YELVERTON and KNOLL, JJ., and FALKENHEINER, J. Pro Tem.[*]
W.C. FALKENHEINER, Judge Pro Tem.
Plaintiff, Em W. Knipmeyer,[1] has sued the Catholic Diocese of Alexandria-Shreveport and the Immaculate Conception Catholic Church of Natchitoches for damages, alleging a breach of an employment contract. The Trial Court rendered Judgment in favor of Plaintiff in the amount of $21,000.00 with legal interest from date of Judicial demand until paid. Defendants have appealed.

FACTS
Plaintiff was an experienced teacher and school administrator, having taught in a number of schools prior to 1971 when Defendants first employed her as principal of its elementary school. She kept this position for three years, but left to accept employment in the Natchitoches Parish School system for the school years 1975-1979. In the Fall of 1979 she returned to the Defendant's school when she was hired as principal, and she acted in that capacity until she was notified by Msgr. Barker on May 23, 1983 that she would not be offered a contract for the coming 1983-1984 school year.
Plaintiff and her supporters received the news of the non-renewal of her contract with considerable dismay and she was emotionally upset by it.
Defendant's school, of which Plaintiff was principal, consisted of a kindergarten through the twelfth grade, and employed approximately forty-four teachers for an enrollment of approximately 430 students. The Church Pastor, who at this time was Msgr. Barker, had the ultimate authority to hire and fire teachers, but he was assisted by the School Board which acted upon *552 teacher contracts submitted to it. Defendants used two writings in connection with the employment of the teachers, both being in the nature of standard forms. Both of these forms had been used in the manner used in this case for a number of years, and Plaintiff, as an administrator, was fully familiar with them.
The first is a one page form circulated by Defendants to the teacher personnel around the month of April of each year. The form is reproduced as an exhibit to this Opinion and was Exhibit P-3 in the record.
The second writing is a form contract submitted to those teachers who had indicated on the first form that they desired to return to the school at the indicated salary, and who had thereafter been accepted by the School Board and Pastor. The first sentence of the contract states:
"You are hereby notified that you have been accepted as a member of the faculty of St. Mary's School________".
The contract also contained a Paragraph O which reads:
"If this contract is to be discontinued, the party who wishes to discontinue the contract shall notify the other party on or before __________ of the current school year. If such notification is not received by __________ of the current year, the teacher shall be bound by the contract for the following year."
When the contract is submitted to the teacher, and the teacher remains willing to accept it, it is then executed by the teacher and then executed on behalf of Defendants by either the Pastor of the Church or the principal of the school. The dates in Paragraph O of the form contract had been routinely left blank in teacher contracts in former years and, in fact, the record does not contain any information that these blanks had ever been completed in any teacher contract. The record also contains evidence that the Plaintiff had herself executed many of these contracts with teachers on behalf of the Defendants as principal in which the blanks were stricken through.
Plaintiff received the survey form in the Spring of 1982, and subsequently executed the form contract on June 1, 1982. Her contract was executed on behalf of the Defendant by the Pastor, Msgr. Barker. As in all the other cases, the dates in Paragraph O of the specific contract at issue here were also left blank.
Each party performed all of the obligations undertaken by it in this contract for the 1982-83 school year.
Plaintiff received Defendant's survey in April of 1983 and returned it to Defendant with the indication that she would like to return to the school for the 1983-84 school year at the proposed salary. As early as January, 1983, Msgr. Barker had considered the possibility of not offering a future contract to Plaintiff, but had taken no action and had not notified her.
After receipt of the indication from Plaintiff that she desired to return for the 1983-84 school year, the School Board met on May 21st and May 23rd of 1983 and on May 23rd, Msgr. Barker notified Plaintiff that she would not be offered a contract for the coming year. This was the first notice that she had of the decision.

ACTION OF THE TRIAL COURT
The Trial Court found that, although Defendants had the right not to renew Plaintiff's contract for the 1983-1984 school year, they had breached the notice provisions set out in Paragraph O of the contract. The Court found this paragraph to be ambiguous and interpreted it against the Defendants. The Trial Court found no bad faith on the part of the Defendants, but applied Civil Code Articles 1957 and 1958 in finding that the notice given Plaintiff on May 21, 1983 was untimely and constituted a breach of contract justifying an award of damages.
Although we agree with many of the Trial Court's findings of facts and conclusions, we disagree with its ultimate decision.

*553 PLAINTIFF'S CAUSE OF ACTION
The Trial Court styled Plaintiff's Cause of Action as a claim for tortious breach of contract giving rise for damages both in contract and in tort. The Court correctly rejected the tort claim, finding no bad faith or negligence, and decided the case as a breach of contract.
Much of Plaintiff's oral argument and brief were directed at the actions of Defendant's agent, Msgr. Barker, implying that they were unjust and unwarranted, but without actually charging negligence or wrongdoing. Plaintiff argues that Msgr. Barker's actions were shocking in that he did not inform Plaintiff in January of 1983 when he first entertained thoughts of not offering her a new contract, that he ordered her to leave the blanks in Paragraph O incomplete in her contract to take some unspecified unfair advantage of her, and refers to testimony of some school patrons that Plaintiff's treatment by the school was unfair in view of her dedication to the school and its pupils.
Plaintiff does not cite Civil Code Article 2315 or any tort authority to support her Cause of Action. In fact, Plaintiff now contends before this Court that when she received the survey form and sent it back to the Defendant on about April 20, 1983 with the indication she would like to return for the 1983-1984 school year at the salary indicated, both she and the school were bound by a new contract which the Defendants have breached, entitling her to damages. (See Civil Code Article 1930 (1870) and Articles 1994, et seq. of the 1984 Revision.)

THE SURVEY FORM OR "LETTER OF INTENT"
The first document referred to here, which is the survey form, or "letter of intent", is not ambiguous. It contains no expression of intent by either the teacher or the school. The letter is really nothing more than a perfectly reasonable and rational memorandum by an employer to its employees in which it makes a disclosure of the matter of primary interest to employees and prospective employees, namely, the salary which might be expected. It also requested an expression or disclosure from the employee with respect to his reaction and whether or not the employee wished to continue for the following year. It also solicited comments and is nothing more than a survey or poll.
There is nothing in this form to indicate that it was a specific offer by either the employer or the employee. That is, the form does not indicate that the school was offering to employ the teacher at a specific position for the forthcoming year, and that a binding contract would result in the event of acceptance. Likewise, there is nothing in the form that would indicate that it was an offer by the employee to bind himself or herself for the forthcoming year in the event of acceptance.
In its written reasons, the Trial Court correctly analyzed the pertinent facts of this case and this form as follows:
"The Plaintiff testified that, in each and every year of her association with Father Barker, she received and executed a contract subsequent to the letter of intent. (Em W. Knipmeyer, Transcript, Page 61, Lines 18-28). The intent letter evidenced no terms or conditions for employment, instead simply being a unilateral request for information sent to all staff members. The actual contract was to be executed subsequent to the May School Board meeting.
Virtually every applicable witness testified that they received and executed the written contract every year. (Em W. Knipmeyer, Transcript, Page 61, 123, 126, 127; Nona Bobo, 189, 193; Claudia Rees, 226, 234; Ricky Primm, 236; Connie Sullivan, 340; Rachal Lincecum, 346, 347; Mary Cunningham, 354; Dulcie Hayes, 414, 417; Linda Atkins, 438). Plaintiff even stipulated to the fact that identical testimony would have been elicited from four addition teacher-witnesses. (Transcript, Page 445-446).

*554 Even more relevant was the testimony by nearly every involved witness that there was no employment until the contract itself was actually executed. (Father Barker, Transcript, Page 150-153; Eugene Scott, 374; Dulcie Hayes, 414, 417, 422; James Mims, 427-433; Linda Atkins, 437-441; Koleta Methvin, Belias Thrasher, Brenda Powell and Maegie Giddens by stipulation, Transcript, Page 445-446). Even Plaintiff's own witness, Claudia Rees, testified that the written contract she had executed constituted the actual agreement between the school and herself. (Claudia Rees, Page 233, Lines 23-26).
As to whether or not the letters of intent were binding on the employees two of the witnesses testified that they sought other employment subsequent to the receipt of the intent letters, but prior to the execution of the contract. (Connie Sullivan, Transcript, Page 340; Dulcie Hayes, 416, 422.
Of key importance is the testimony by Ricky Primm and Rachal Lincecum concerning statements made by Plaintiff to them regarding the effect of the "letter of intent". Neither witness was a party to the litigation, and both witnesses had received identical information from Plaintiff".
This situation presents basic problems of contract law in which the essential elements of consent, evidenced by an offer and acceptance, is concerned. (See Civil Code Articles 1797, et seq., particularly Article 1798 and Civil Code Articles 1927, et seq. contained in Chapter 3 of the 1984 Obligations Revision).
An offer has been defined as a proposal to enter into a contract, but all proposals are not offers since the proposal must meet certain conditions. One condition is a declaration by the offeror of his intention. The second requirement is that the proposal must be precise in that it firmly reflects the intent of the offeror to enter into a contract and must contain certain language distinguishing it from mere proposals or invitations to negotiate. It must also be precise and complete so that the essential requirements of the contract are entered into with the indication that acceptance by the offeree will suffice to form the contract. (See Alain A. Levasseur, Precis on Conventional ObligationsA Civil Code Analysis at page 32). The acceptance must meet the same standards of reasonable certainty as the offer. Professor Saul Litvinoff expresses these principles as follows:
"No particular form is required for the offer or acceptance. Either of them, the offer, as well as the acceptance of a contract, may be expressed, implied or tacit: express when evinced by words, either written or spoken; implied when manifested by actions; tacit when evidenced by silence or inaction, or when the circumstances of a particular situation, or a legal presumption directs the consideration of actions, silence or inaction as evidence of consent. However, as an offer is an indispensable element of that concurrence of the will which the contract consists, it is of utmost importance to determine whether a certain declaration of will amounts to a real offer or is a mere declaration made without an intention of becoming bound, such as a simple proposition, or a simple pollicitation. The same problem exists when it is necessary to ascertain whether a certain declaration amounts to an acceptance.
An offer is a proposal to do something or to refrain from doing something in return for a counterpromise, an act, or forebearance. To be considered properly as such, the offer must fulfill the following three requirements clearly established in the Louisiana Civil Code:
(a) The design to give the other party the right of concluding the contract by his assent.
(b) The offeror's intention to obligate himself.
(c) A serious intent.
(See 28 La. Law Review, PP. 2 and 3.)"
There is an additional reason why the contention of Plaintiff that the binding contract came into being immediately upon her *555 return of the executed form letter must be rejected. This reason is found in the principle enunciated in Civil Code Article 1947:
"Article 1947. Form Contemplated by the Parties.
When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." (Emphasis supplied)
As indicated in the comment, this is a new Article which did not exist in our Civil Code prior to the 1984 Revision. However, the comment further notes that is does not change the law since it is a rule which has been consistently followed in Louisiana jurisprudence. The comment cites the cases of Laroussini v. Werlin, 52 La.An. 424, 27 So. 89 (1899); Breaux Brothers Construction Co. v. Associated Contractors, Inc., 226 La. 720, 77 So.2d 17 (1954); Waldhauser v. Adams Hats, 207 La. 56, 20 So.2d 423 (1944).
The Supreme Court opinion in the Breaux Brothers Construction Co. case, supra, sets forth this principle in detail, as follows:
As far back as the year 1814 this court held that, where it has been agreed between the parties that an agreement shall be reduced to writing, the contract is not complete until it is written and signed by all the parties. Villere v. Brognier, 3 Mart., O.S., 326.
In Fredericks v. Fasnacht, 30 La.Ann. 117, this court said:
"* * * It is elementary in our law, that where the negotiations contemplate and provide that there shall be a contract in writing, neither party is bound until the writing is perfected and signed. The distinction is manifest between those cases in which there is a complete verbal contract, which the law does not require to be reduced to writing, and a subsequent agreement that it shall be reduced to writing, and those in which, as in this case, it is a part of the bargain that the contract shall be reduced to writing. In the first class of cases the original verbal contract is in no manner impaired by the failure to carry out the subsequent agreement to put it in writing. In the second class of cases, the final consent is suspended; the contract is inchoate, incomplete, and it can not be enforced until it is signed by all the parties. Villere v. Brognier, 3 Mart., O.S., 326, 349; Des Boulets v. Gravier, 1 Mart., N.S., 420, 421, 422; Bloeker v. Tillman, 4 La. 77, 80."
This principle of law has been consistently adhered to by this court ever since. See Evans v. Dudley Lumber Co., Inc., 164 La. 472, 114 So. 101, and authorities cited therein.
Since the parties in the instant case intended from the beginning to reduce their negotiations to a written contract, neither the plaintiff nor the defendant was bound until the contract was reduced to writing and signed by them. Therefore, even if all of the terms of the alleged contract between plaintiff and defendant had been verbally agreed upon, no valid contract would have existed between the parties because this case falls within the second class of cases discussed in Fredericks v. Fasnacht, supra, and therefore in this case the final consent of the parties was suspended until such time as the contract should be reduced to writing and signed by all the parties.
Therefore, because the element of consent is lacking for the reasons set out above, it is obvious that plaintiff has not established the existence of a valid contract under Article 1779 of the Civil Code, and consequently cannot recover.
There was no offer by either party, but even if the letter were considered as an offer by Defendant, which it clearly is not, Plaintiff's acceptance was not clear and unequivocable. Finally, the facts in this case clearly indicate that the parties contemplated the execution of a particular form contract. This was never done.
Accordingly, the contention that a binding agreement resulted when Plaintiff returned *556 the executed survey form must be rejected.

THE ULTIMATE CONCLUSION OF THE TRIAL COURT
As noted, the Trial Court adopted a different approach from that advocated by Plaintiff in ruling adverse to Defendants. After concluding that the first form was simply a tool for gathering information, that Defendants had the right not to offer Plaintiff a new contract, that the existing contract in Paragraph O required reasonable notice that Defendants were exercising that right, that Defendants were obligated to give that notice on or about April 20, 1983, and that notice on May 24, 1983, was unreasonable and a breach of the existing contract, the Trial Court awarded damages in the amount of the next years salary. The Court applied recognized principles of Civil Code Articles 1957 and 1958 (1870), (but see Articles 2056 and 2057 of the 1984 Revision and pages 68 and 69 of the expose des motifs-L.S.A.-C.C. Obligations 86, Special Pamphlet) in determining that the old contract was renewed because of Defendant's failure to give simultaneous notice of its intent not to offer another contract when it receives Plaintiff's response to the form indicating a desire to return to the school.
The contract involved here was on Defendant's standard form. It says nothing about renewal or reconduction, nor does it contain any requirements on the part of either party to give some notice that it will terminate at its expiration, a fact which is self evident. The Trial Court found the requirements of notice and renewal in Paragraph O because of the blanks.
The fact that dates were not inserted in the blanks of Paragraph O does arguably cast some doubt as to when the party desiring to discontinue this contract must notify the other. Assuming that the contract does impose some duty upon the Defendants to give notice to the Plaintiff that she would not be offered a new contract, the only uncertainty is when during the school year it is to be given.
Civil Code Article 1958 (1870) was the applicable law at the time of these events, but the revised Article (Civil Code Article 2056), which did not change the law, reflects the updated version of the basic principle involved, and provides a guideline for interpreting this paragraph.
"Article 2056. Standard Form Contracts.
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against a party who furnished its text.
A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." (Emphasis supplied)
In this instance the record indicates clearly that any doubt caused by the failure to insert dates within the blanks of Paragraph O can otherwise be resolved. Civil Code Article 2053 as revised in 1984 codifies long recognized principles to be followed in resolving any doubt:
"Article 2053. Nature of contract, equity, usages, conduct of the parties, and other contracts between the same parties.
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." (Emphasis supplied)
The record in this case, as analyzed by the Trial Court, supra, contains unquestioned evidence of the following facts and circumstances which explain and resolve any doubt about the blank dates in Plaintiff's contract at issue here:
1. Plaintiff was a long time employee of Defendants and occupied the highest employee position in the school as principal. She was thoroughly familiar with all of the details of the Defendants' needs and hiring procedures. She had sent the survey form to numerous employees, and had received it herself as an employee for a number of years. She had executed the contract on *557 behalf of Defendants in many instances for a number of years and had received a contract each year herself as an employee.
2. Plaintiff and all employees of Defendants clearly understood that their employment was on a year to year basis and that a contract would be signed, and was signed for each year.
3. That in no instance were the blanks in Paragraph O of the employee contracts ever completed. That Plaintiff in many contracts in which she executed on behalf of the Defendants as principal, had stricken through the blanks. That by using the form letter, Defendants obtained from their employees a survey indicating those who might accept employment for the coming year after having been informed of the salary terms of the proposed new contract, thereby making dates in Paragraph O unnecessary.
4. Plaintiff attended the School Board meetings and was aware that after receipt of the survey information, Defendants determined their faculty requirements and which teachers would be submitted contracts for the coming year. That she was present on a number of occasions when the School Board, which met in the month of May each year, would vote to extend a contract to her.
5. Plaintiff was aware that on occasion teachers had executed the survey form indicating a desire to return, as she had done in this instance, and then, even after the end of the school year, decided they did not wish to execute a tendered contract and had not been challenged by the Defendants as breaching a contractual obligation, thereby having personal knowledge that Defendants did not consider themselves nor their teachers bound until the written contract was executed.
6. As one of the Defendants' administrators, Plaintiff was well aware that Defendants were not in a position to tender new contracts to its teacher employees until they had met with the School Board near the end of each year, determined projected student enrollments, funding, the number of teachers who desired to return as reflected on the survey, and the other multitude of administrative matters required in the running of a school of this size.
7. Although Plaintiff attempted to attack the credibility of one of the teacher-witnesses, there was compelling evidence that Plaintiff herself had specifically advised teachers at meetings that the survey was for information only, and that no contract existed until the contract form had been tendered and accepted by both parties.
Assuming that Plaintiff's expression of a desire to return to the school and the provisions of Paragraph O of her current contract created some affirmative duty on the part of the Defendants to notify her that she would not be offered a new contract, we, nevertheless, disagree with the Trial Court's finding that the actions of the Defendants in this case and under all of these circumstances, constituted unreasonable notice and a breach of the contract.
Plaintiff has suggested that she should have been notified as early as January when Msgr. Barker first had some ideas of not offering her a new contract, or as early as February 15th. The Trial Court correctly rejected both of those contentions. The evidence is not persuasive that Msgr. Barker had reached a firm decision in January, and even if he had there is no legal reason why that should have been communicated to Plaintiff at that time. The February 15th date suggested by Plaintiff was arrived at because the Defendants had been considering the possibility of adopting a comprehensive manual covering all of the school's operations of which teacher employment was only a part. The date of February 15th is suggested in this draft as the date on which the school should conclude its contractual negotiations with teachers for the coming school year. This manual was a draft only and had never been adopted or followed by the school which continued to operate under the procedures outlined above. All parties knew that the survey would be forthcoming in the month of April. Defendants had no *558 way of knowing whether or not Plaintiff even desired to return until some decision had been reached on the amount of a proposed salary, and she had been notified and given the opportunity to express her views about the salary and any other matters. She did this on April 20, 1983 by returning the survey.
It would be unreasonable, as the Trial Court would have it, that the Defendants then be required to make an immediate or simultaneous response upon receipt of Plaintiff's reply. The fact that Defendants followed the practices of the past, well known to the Plaintiff as outlined above, and took the matter up with the advisory School Board for consideration of all applicable factors before making a decision and giving the notice was entirely reasonable. The Defendants did this within approximately one month and gave notice to the Defendant on May 23rd, 1983 which was still within the school year and the provisions of Paragraph O.
The fact that Defendant's actions were not unreasonable is particularly true since this is not a case where the parties were negotiating on an unequal basis, where there was fault or negligence on the part of either, or where one party had mislead the other to his detriment. To the contrary, Plaintiff was fully apprised and cognizant of all the procedures and facts, and there are valid and compelling reasons why the Defendants had to announce the faculty assignments approximately one month after receipt of the survey which dealt with only one aspect of the many to be considered in running a school of the size involved here.

DISPOSITION
The decision of the Trial Court is reversed at Plaintiff's cost.
KNOLL, J., dissents for reasons assigned by DOUCET, J.

*559 EXHIBIT

*560 DOUCET, Judge, dissenting.
I respectfully dissent for the following reasons. This is an appeal from a judgment granting damages for breach of an employment contract between Mrs. Em K. Knipmeyer and the Catholic Diocese of Alexandria-Shreveport and the Immaculate Conception Catholic Church of Natchitoches.
The facts of the case were clearly and accurately outlined by the trial judge in his reasons for judgment. Mrs. Knipmeyer served as the principal of St. Mary's High School for the three school years prior to May, 1983. The school consists of kindergarten through twelfth grade with 450 students, and a staff of about 44 including teachers, administrators, and support personnel. While it is operated by the Immaculate Conception Catholic Church under the supervision of the Diocese of Alexandria-Shreveport, ultimate administrative responsibility for the school rests with the Pastor of Immaculate Conception Church, Monsignor Harry O. Barker. Both Msgr. Barker and the Superintendent of Schools for the Alexandria-Shreveport Diocese, Sister Marjorie Hebert, testified that Msgr. Barker has complete authority as to employment and dismissal of school personnel. It was agreed that Sister Marjorie's role was purely advisory.
During the 1982-83 school year, Mrs. Knipmeyer served as principal under an employment contract signed June 1, 1982. Paragraph "O" listed under "Express Conditions" of the contract, as signed by the plaintiff and Msgr. Barker, provides as follows:
o) If this contract is to be discontinued, the party who wishes to discontinue the contract shall notify the other party on or before __________ of the current school year. If such notification is not received by __________ of the current year, the teacher shall be bound by the contract for the following year.
On or about April 20, 1983, as was customary at about that time each year, Mrs. Knipmeyer received a "letter of intent" from the school. The letter indicated that her salary for the 1983-84 school year would be $21,000.00 and contained blanks in which she could indicate her intent to return or not return as principal for the following year, as well as whether her current assignment was satisfactory to her. Mrs. Knipmeyer signed and returned the form with an indication of her intent to return for the following year, the 1983-84 school year, and of satisfaction with her position.
On the afternoon of May 23, 1983, Mrs. Knipmeyer was called to the office of the Pastor of Immaculate Conception Church and informed that she would not be rehired for the 1983-84 school year. Mrs. Knipmeyer testified that this was the first indication she received of any move not to renew her contract. Msgr. Barker indicated that the decision not to renew Mrs. Knipmeyer's contract came as a result of his desire to pursue a new educational direction for the school; and not because of any lack of professional confidence in her. He testified that he delayed informing her of the decision until the end of the school year; first, because he was not absolutely certain he would replace her until that time; and second, because of his fear that she would walk out without completing the school year. That same day, the school board voted to approve the non-renewal of Mrs. Knipmeyer's contract. Mrs. Knipmeyer testified that she was emotionally devastated by this unexpected dismissal. Although she was offered a job as an elementary school teacher with the Natchitoches Parish Public School System at a salary of $16,000 per year, she refused the job based on her emotional state and because it was not in her field of expertise. The Natchitoches Parish Public School System was, at that time, under a Federal Court-ordered hiring freeze on administrative positions.
Mrs. Knipmeyer brought this suit against the Diocese and Immaculate Conception Church. After a trial on the merits the trial court rendered judgment insolido against the defendants and in favor of the plaintiff in the amount of $21,000.00, or the *561 amount of the lost salary. The trial judge found that, although Msgr. Barker had a right not to renew Mrs. Knipmeyer's contract for the 1983-84 school year, he had breached the notice clause, paragraph "O" of the old (1982-1983) contract. Because of the ambiguities in Paragraph "O" of the old contract, the trial judge interpreted it against the defendants. On a finding of no bad faith on the part of the defendants, the trial judge refused to grant damages for mental anguish. However, he found that the defendants' conduct prevented Mrs. Knipmeyer from mitigating her damages. The defendants appeal. Mrs. Knipmeyer answers seeking damages for mental anguish.
While Msgr. Barker had a right to dismiss Mrs. Knipmeyer, he was bound to do so in accord with her contract for the 1982-83 school year.
There is no dispute as to the existence or validity of the employment contract between Immaculate Conception Church and Mrs. Knipmeyer for the 1982-83 school year. Paragraph "O" of that contract, quoted above, provides that if a party does not give notice of a desire to terminate the contract by a date left blank, the contract is renewed for the following year. Mrs. Knipmeyer stated that the blanks were left at the instruction of Msgr. Barker. Generally, where there is doubt as to a contractual provision, it is interpreted against the party who prepared the contract. La.C.C. art. 1957. Furthermore, if the doubt or obscurity arises because one of the parties failed to give a necessary explanation, either through negligence or fault, the construction most favorable to the other party must be adopted. La.C.C. art. 1958.
The 1982-83 employment contract signed by Mrs. Knipmeyer, was provided by Msgr. Barker and signed by him as Pastor of Immaculate Conception Church. The blanks left in Paragraph "O" were left at his instruction. Therefore, Paragraph "O" must be interpreted in the way most favorable to Mrs. Knipmeyer. The trial court found that Paragraph "O" should be interpreted to require reasonable notice on the part of the party wishing to terminate the contract. In the absence of reasonable notice, the contract would be automatically renewed for the following year.
In April, 1983, the school, through the letter of intent, required Mrs. Knipmeyer to give notice as required by Paragraph "O" of the 1982-83 contract of her intent to return for the 1983-84 school year. The trial court found that the defendants were "under a reciprocal duty to notify teachers and administrators of its plans at the same time". Finding no manifest error on the part of the trial court, I agree.
The failure of the defendants to give Mrs. Knipmeyer notice of their intent not to renew within a reasonable amount of time triggered automatic renewal of the old contract as provided by Paragraph "O". The defendants' subsequent notice to Mrs. Knipmeyer that they did not intend to employ her for the 1983-1984 year was a breach of that renewed contract. As a result, Mrs. Knipmeyer is entitled to damages in the amount of the salary of which she was deprived. In the absence of any evidence of bad faith on the part of the defendants, no damages for mental anguish experienced by Mrs. Knipmeyer are appropriate. La.C.C. art. 1933.
Due to the mental state brought on by her abrupt dismissal, the short time given Mrs. Knipmeyer to find a new job since she was dismissed at a time of year when most school employment decisions have been made, as well as the employment situation for school administrators in the Rapides Parish area, it was not possible for Mrs. Knipmeyer to mitigate her damages. While she was offered a position as an elementary school teacher, she cannot be required to take a position beneath her proven qualification merely to relieve the defendants of a burden they brought upon themselves.
Accordingly, the judgment of the trial court should be affirmed.
NOTES
[*] Honorable W.C. Falkenheiner of the Seventh Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Mrs. Knipmeyer died in September, 1985. Her surviving spouse, William B. Knipmeyer is substituted as Plaintiff-Appellee.