GLENEAGLE CIVIC ASSOCIATION, a
Colorado nonprofit corporation,
Plaintiff–Appellant,

v.

Lewis D. HARDIN and Laura L. Hardin,
Defendants–Appellees.

No. 07CA1918.

Colorado Court of Appeals,
Div. II.

Oct. 16, 2008.

Rehearing Denied Feb. 5, 2009.

Anderson, Dude & Lebel, P.C., Wm. Kelly Dude, Colorado Springs, Colorado, for Plaintiff–Appellant.

Mulliken Weiner Karsh Berg & Jolivet, P.C., Murray I. Weiner, Joseph L. Lambert, Colorado Springs, Colorado, for Defendants–Appellees.

Opinion by Judge BERNARD.

Plaintiff, Gleneagle Civic Association (the association), appeals the trial court's judgment denying its request to impose a fine and require the removal of a fence constructed by defendants, Lewis D. Hardin and Laura L. Hardin (the homeowners). We reverse and remand for further proceedings.

## I. Background

The association is a homeowners association in El Paso County. The homeowners, who lived in California, wished to purchase land and build a house on property (the property) within the area served and controlled by the association. The property bordered one fairway of a golf course.

Before finalizing the purchase, the homeowners received a copy of the association's covenants. After reviewing them, the homeowners mailed a certified letter (the plan) to the association on May 13, 2004, seeking approval to construct a six-foot stockade privacy fence on the property line between the property and the fairway. The homeowners wanted to protect the privacy of their guests, shield them from errant golf balls, and corral the family dog. They sought a decision by May 27, the date on which they were scheduled to close their purchase of the property. According to a pleading filed by the home-

owners, the association did not sign for, and thus did not receive, the plan until May 23.

The homeowners also sent the plan via e-mail on May 25 to the chairman of the association's architectural control committee. The plan stated that the homeowners had stopped all work on the property until they received a response from the association about whether it would approve the fence.

The chairman replied by e-mail, which stated:

We will be reviewing and I will let you know. I am not optimistic at this time. Tall cedar fence across the front and sides will be a major issue. Split rail is fine in the rear of the house.

On May 26, the homeowners sent the chairman an e-mail reiterating that they needed an immediate response to the plan because they were to close on the property the next day.

On May 27, approximately thirty-nine hours after e-mailing the plan, the homeowners sent another e-mail to the chairman. It read:

Based on: 1) the apparent arbitrary and capricious record of [the association], and the complete lack of response to the repeated requests for a decision prior to the transfer of ownership on said property; and 2) absolutely no evidence contained within any recorded [association] document . . . of any restrictions that would prohibit the immediate approval of my request for architectural approval it is hereby deemed/conclusively presumed that the request as submitted . . . has been completely accepted and approved without exception.

The e-mail concluded with a statement that the homeowners were traveling from California to Colorado to attend the closing and would be unable to communicate via e-mail.

Approximately seven hours later, the chairman replied with an e-mail that stated:

I haven't been able to make contact with you by phone but left you messages. . . . As I previously emailed regarding the fencing you want to use[,][t]his will be a compliance issue with the [association] covenants and cannot be approved. However,

the split rail fence is not [an] issue. Maybe tree[s], bushes, etc., could be incorporated to help provide some of the privacy you want to achieve.

On May 28, the chairman sent the following e-mail to the other members of the architectural control committee:

I spoke to the Land Title Company yesterday before closing as well as the [homeowners'] Realtor. The closing was supposed to be at 4:00 P.M. [today]. I had requested that [the homeowners] contact me before closing. I never received any calls or email. [The homeowners are] well aware of the non compliant issues regarding the fence. When [they move into the house] I will contact [them]. I think we should let it be for now.

The closing occurred on May 27, and the homeowners began to build the fence described in the plan on or shortly before June 20. On that day, two members of the architectural control committee visited the property and told the homeowners that the plan had not been approved.

On June 21, the chairman sent another e-mail to the homeowners. It stated:

Here is another copy of the email sent to you on May 27. I also phoned you and left messages on your cell phone. . . . Since I did not hear back from you via email or phone I contacted your closing agent . . . and notified her regarding the covenant violation and that the fencing proposed would not be approved. I also asked her to have you contact me. . . . I [also] contacted your realtor . . . and advised him that the fence that you proposed was a covenant violation and would not be approved by [the association]. I also asked him to have you contact me as soon as he heard from you.

In their pleadings, the homeowners admitted they received and read this e-mail.

On June 22, the homeowners sent their realtor an e-mail asking whether he had been informed that the plan had been denied before the closing was held. The homeowners wrote that they did not "recall [the realtor], nor anyone else providing any information

that [their] request for fencing approval was denied."

The realtor responded as follows:

[The chairman] did not tell me that your application for fencing had been denied, rather we discussed at length the fact that he felt the [association] would not agree to your proposal, which we already knew at that point. I suggested that based on the fact that so many others in the neighborhood had fencing like what you were proposing for your home that they make another exception and allow you to proceed.... He responded that others had tried to press the fence issue in the past but had not gotten anywhere.... The next time I saw you was at the closing table which I felt was not the time or place to be calling [the chairman] and arguing over the fencing issue.

On July 13, the association sent the homeowners a letter which instructed them to remove the fence on the property line. The homeowners refused, and the association filed suit, requesting that the trial court order the homeowners to remove the fence and asking that fines be imposed for their violation of the covenants.

After a bench trial in June 2007, the trial court concluded that (1) the homeowners had properly submitted the plan, but the association did not communicate its disapproval of the plan within thirty days, as required by the covenants; (2) the association's e-mails did not comply with the procedures in the covenants for providing notice of its disapproval, which required the use of regular mail; and (3) the covenants' restrictions on fencing were vague and unenforceable. The court subsequently awarded the homeowners attorney fees.

## II. Standing

The homeowners contend that the association did not have standing to enforce the covenants because it is not the "declarant." The trial court ruled that the homeowners waived this issue. We disagree with the homeowners' position, although on grounds different from those upon which the trial court relied. *See Negron v. Golder,* 111 P.3d 538, 542 (Colo.App.2004) (if the trial court reached the correct result, we may affirm its determination on different grounds).

■■■ "Because standing is a threshold jurisdictional question, we must address it first...." *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 436 (Colo.2000). A determination that a party does not have standing is a legal question we review de novo. *Reeves v. City of Fort Collins,* 170 P.3d 850, 851 (Colo.App. 2007).

■■ To have standing, a plaintiff must have suffered an "injury in fact," and the injury must be to a "legally protected interest." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). The issue of standing may be raised at any time. *Brass Monkey, Inc. v. Louisville City Council,* 870 P.2d 636, 638–39 (Colo.App.1994) (party did not waive right to challenge opponent's standing by failing to object in the trial court to the opponent's intervention).

Here, the homeowners argue that, according to an assignment of declarant rights executed in 1993 (the assignment), a nonprofit Nebraska corporation called Bethesda Associates (Bethesda) was the only entity that could approve the plan. The assignment stated that Bethesda could transfer any of its reserved rights to an architectural control committee, but that it "reserve[d] its rights to function as the Architectural Control Committee for all new construction," including the right "[t]o grant the permissions with respect to fences ... as to new construction." "New construction" was defined to be "construction of a residence on a Lot where no residence presently exists."

The assignment also read that its reserved rights to approve new construction would "cease and terminate" and would "automatically pass to the [association]" when new construction on a lot was substantially completed. The assignment provided:

[Construction] shall be deemed to be substantially complete and [Bethesda's] rights shall be deemed automatically transferred to the [association] as to such lot one year after the issuance of all inspections in con-

nection with the construction of such residence.

Thus, the homeowners contend, the association did not have standing in this case because (1) the fence was new construction, erected during the building of a new house on a vacant lot; (2) only Bethesda could enforce the covenants; and (3) the association did not present any evidence to establish that it was Bethesda, or acting on Bethesda's behalf.

However, the homeowners' argument is rebutted by an amendment to the restated declaration that was recorded in 2001 (the amendment). The amendment contains the history of the Gleneagle subdivision since its inception in 1973. It indicates that there have been four declarants who filed declarations, restated declarations, and amended declarations. Bethesda was the third declarant, and the amendment reads that Bethesda, as the "then [d]eclarant," filed an amended and restated declaration in 1994. In the next paragraph, the amendment states that "[the association] is the successor in interest to the [d]eclarant as that term is used" in all previously filed declarations.

■ The record establishes that, in 2004, Bethesda was no longer the declarant, and that the association had succeeded Bethesda as the declarant. Thus, we conclude that (1) the association had standing to enforce the covenants, including covenants regulating the construction of new fences for new houses, because it was the declarant with the authority to do so; and (2) the association therefore had standing to bring this lawsuit, because it alleged an injury in fact to its legally protected interest.

### III. The Parties' Obligations Under the Covenants

■ "Construction of a covenant is a question of law that requires de novo review." *Buick v. Highland Meadow Estates at Castle Peak Ranch, Inc.,* 21 P.3d 860, 862 (Colo.2001). When interpreting a covenant, we follow the rules of plain English and enforce the covenant as written if it is clear on its face. *Id.*

Our de novo review of the pertinent covenants leads us to conclude that they establish the following process for owners of property subject to the covenants to build fences on their property:

- "No fence shall be installed without the prior written approval of [the association]."
- "Matters which require the approval of the [association] include ... [a] fence."
- To obtain this approval, an owner must submit written "plans, specifications and other information" about the proposed fence to the association.
- An owner submit[s] plans to the association when they are "delivered by mail or otherwise" to the association's address.
- The association must then issue "[a] written statement of the approval or disapproval or other action" regarding the plan.
- The association provides its written response to plans when the response is delivered by mail or otherwise "a) to the dwelling situate on the lot owned by that owner; or b) if there is no dwelling, then to the address furnished by the [o]wner to the [association] and if the [o]wner has not furnished an address, then to the most recent address of which the [association] has a record."
- "If [the association] does not execute and acknowledge such a statement within thirty (30) days after delivery of all the required materials to [the association's] principal office, the material so delivered shall stand approved for the purpose of these covenants."

### IV. The Association's Decision to Deny the Plan Was Delivered to the Homeowners Within Thirty Days of When the Plan Was Delivered to the Association.

The association contends that the trial court erred when it concluded that, because "e-mail transmission technology ... did not even exist at the time of the covenant[s'] adoption," the e-mails sent by the chairman did not constitute proper notice to the homeowners of the association's decision to deny the plan; and, thus, the homeowners did not receive notice that the association would not

approve the plan until more than thirty days after the plan was delivered to the association. We agree.

### A. When Was the Plan Delivered to the Association?

■ An owner submits his or her plans to the association when they are "delivered" to the association. "Delivery" means "[t]he formal act of transferring something, such as a deed; the giving or yielding possession or control of something to another." *Black's Law Dictionary* 461 (8th ed.2004). Thus, the word "delivered" means that delivery is complete, which, in this context, means that the plans must have been received by the association. *See Sargent v. Paine Webber Jackson & Curtis, Inc.,* 882 F.2d 529, 531 (D.C.Cir.1989)(rejecting argument that phrase "filed or delivered" means "mailed or otherwise sent").

Here, the homeowners sent the plan to the association by certified mail on May 13. The association did not sign for, and, thus, did not receive, the plan until May 23. The homeowners conceded that May 23 was the date that began the thirty-day calculation in a pleading in this case, in which they wrote:

> [The plan] sent by certified mail on May 13, 2005[sic], was not picked up until May 23, 2004 and further clarified/received on May 24, 2004. At no time during the ensuing 30–day period did the association disapprove the request. At no time during the same 30–day period did the association notify the [homeowners] in writing that their request had been denied.

Based on the information in the record, together with this statement, we conclude that the plan was delivered to the association on May 23. *Cf. Emrich v. Joyce's Submarine Sandwiches, Inc.,* 751 P.2d 651, 652 (Colo.App.1987) (litigant is bound by admissions made in pretrial pleadings). Thus, the thirty-day period for the association to review the plan and either approve or reject it began on that date.

### B. When Did the Association Give the Homeowners Notice That It Was Rejecting the Plan?

■ The association contends that trial court erred by concluding that the e-mails the chairman sent were not proper notice of the association's decision to reject the plan because they were not writings that provided notice "by mail or otherwise." We agree.

#### 1. The E–Mails Were "Writings."

A "writing" is defined as "[a]ny intentional recording of words in a visual form, whether in the form of handwriting, printing, typewriting, or any other tangible form." *Black's* at 1641. "E-mail" is defined as "[a] communication exchanged between people by computer." *Id.* at 560.

Whether an e-mail constitutes a "writing" is an unsettled question of law. *Compare Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289, 296 (7th Cir.2002) (finding an e-mail satisfies the statute of frauds); *Roger Edwards, LLC v. Fiddes & Son, Ltd.,* 245 F.Supp.2d 251, 261 (D.Me.2003)(finding e-mails are "writings" for purposes of non-Uniform Commercial Code statute of frauds), *aff'd in part and dismissed in part,* 387 F.3d 90 (1st Cir.2004); *and Klebanoff v. Haberle,* 978 So.2d 598, 604 (La.Ct.App.2008)(finding e-mails were permissible means of achieving settlement agreement), *with* Terrence Floyd Cuff, *Real Estate and the Deferred Exch. Regulations, in Fifth Annual Real Estate Tax Forum,* 562 PLI/Tax 457, 623 (Feb.2003) ("Neither Congress nor the Internal Revenue Service [has] confirmed whether email transmissions are 'in writing.' Someday the law should be resolved in favor of email transmissions being in writing, but it may be expensive to be the first test case."), *and* Douglas B. Lang, *Electronic Settlement Agreements: Are They Enforceable in Texas?,* 64 Tex. B.J. 638, 645 (2001) ("only under a strict or formalistic construction of 'writing' would email not comply" with the requirements of a contract).

We conclude that the e-mails in this case are writings, because we are persuaded by the reasoning in the authorities, cited above, that have previously reached the same conclusion. Although the e-mails were originally in electronic form, they were a visual recording of words.

#### 2. The E–Mails Were Delivered by "Mail or Otherwise."

"Otherwise" is defined as "in a different way or manner," *Webster's Third New International Dictionary* 1598 (2002).

It is uncontested that the e-mails were not delivered by conventional mail. However, the record indicates, and the homeowners do not dispute, that the e-mails were sent to, and received at, the homeowners' e-mail address on the dates listed above. Thus, because the rejection of the homeowners' request was delivered in a different way or manner from conventional mail, we conclude that the chairman's writing, in the form of e-mails, was delivered to the homeowners "by mail or otherwise." *Cf.* § 38–33.3–209.4(3), C.R.S.2008 (public disclosures under Colorado Common Interest Ownership Act shall be accomplished by one of several means, including "[p]osting on an internet web page with accompanying notice of the web address via first-class mail or e-mail"); § 38–33.3–308(2)(b)(I), C.R.S.2008 ("If such electronic means are available, the [homeowners] association shall provide notice of all regular and special meetings of unit owners by electronic mail to all unit owners who so request. . . .").

Further, the record indicates that the homeowners felt that communication by e-mail was a proper method of seeking the association's approval. They initiated the e-mail exchange with the chairman on May 25, and, using the same medium on May 27, they expressed their position that the association had approved the plan by not providing them with an answer before the closing.

Moreover, the record contains evidence indicating that the homeowners intended to build the fence without the association's approval. They sent the chairman an e-mail on May 27, which read that (1) there had been a "complete lack of response [by the association] to repeated requests for a decision" before the closing date; and (2) the homeowners "deemed/conclusively presumed" that the plan "has been completely accepted and approved without exception." This statement, sent a day after the plan was delivered to the association, indicated that the homeowners did not intend to wait thirty days for approval of the plan, contrary to the requirements of the covenants. Indeed, the homeowners began erecting the fence less than thirty days after the plan was delivered to the association.

3. The Homeowners Received Notice of the Association's Decision to Reject the Plan Within Thirty Days of Submitting the Plan.

The record contains undisputed evidence that the homeowners were put on notice that the plan would not be approved within the thirty-day period following May 23. First, the May 25 e-mail indicated that the chairman was not "optimistic" about the prospects of the plan's approval.

Second, the May 27 e-mail clearly stated that the plan would not be approved. However, the homeowners' e-mail earlier that day indicated that they were leaving to attend the closing and would not be able to receive e-mail. Thus, it is possible that they did not receive this e-mail on May 27. However, the realtor's June 22 e-mail to the homeowners indicates that, as of May 27, the homeowners were aware the chairman thought it was unlikely that the association would approve the plan.

It is not contested that the June 21 e-mail, in contrast, was received and read by the homeowners. Thus, they had actual notice, within thirty days of May 23, that the association had rejected the plan. *See Powder Mountain Painting v. Peregrine Joint Venture,* 899 P.2d 279, 281 (Colo.App.1994)(" '[A]ctual notice' is such notice as is positively proved to have been given to a party directly and personally, or such as the party is presumed to have received personally because the evidence within the party's knowledge was sufficient to put the party upon inquiry.").

The record indicates that the homeowners wanted a decision on whether the plan would be approved before the May 27 closing. However, the association, through the chairman, did not promise that a decision would be made before the closing. Indeed, the chairman indicated on May 25 that approval was unlikely.

Because we have concluded that the homeowners were on actual notice of the association's decision to reject the plan within thirty days of the date upon which the plan was delivered to the association, we need not

address the homeowners' arguments concerning other deficiencies in the notice. *See Hansen v. Barmore,* 779 P.2d 1360, 1362 (Colo.App.1989)(when the purposes of the notice provisions of an insurance policy are met by actual notice to the insurer, strict compliance with the notice provisions is not required); *cf. People ex rel. Setters v. Lee,* 72 Colo. 598, 603–04, 213 P. 583, 586 (1923) ("The general rule in respect to notices is that mere informalities do not vitiate them so long as they do not mislead, and give the necessary information to the proper parties.").

## V. Vagueness of the Covenants

The association contends the trial court erred by holding that the covenants regarding fencing were vague and, therefore, unenforceable, because "there are no written standards or guidelines upon which a homeowner can rely regarding the material, height, structure, placement, or design of a fence." We conclude that the trial court did not apply the proper test to resolve this issue, and that a remand is necessary for the court to do so.

▮▮▮▮▮ When interpreting a covenant, courts resolve all doubts against the restriction and in favor of free and unrestricted use of property. *Buick,* 21 P.3d at 862. But, this presumption against restriction "has no application when the language is definite in its terms. One must follow the dictates of plain English." *D.C. Burns Realty & Trust Co. v. Mack,* 168 Colo. 1, 4, 450 P.2d 75, 76 (1969). Whether the language in the covenants is vague or ambiguous is a question of law that we review de novo. *Lake Durango Water Co. v. Pub. Utils. Comm'n,* 67 P.3d 12, 20 (Colo.2003); *Terry v. Salazar,* 892 P.2d 391, 393 (Colo.App.1994), *aff'd,* 911 P.2d 1086 (Colo.1996). Where possible vagueness exists, we must look to the intention of the parties "to be ascertained from the entire language of the covenant agreement." *Becker v. Arnfeld,* 171 Colo. 256, 259, 466 P.2d 479, 480 (1970).

In *Rhue v. Cheyenne Homes, Inc.,* 168 Colo. 6, 7–9, 449 P.2d 361, 362–63 (1969), a property owner argued that a covenant was unenforceable because it did not contain specific standards to guide an architectural control committee's decisions. The covenant stated:

> No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure shall have been approved by the architectural control committee....

*Id.* at 8, 449 P.2d at 362.

The supreme court concluded that the covenant was enforceable:

> So long as the intention of the covenant is clear (and in the present case it is clearly to protect present and future property values in the subdivision), covenants such as the one before us have been up-held against the contention that they lacked specific restrictions providing a framework within which the architectural committee must act....

> While we have here enunciated the proposition that the covenant requiring approval of the architectural committee before erection of a house in the subdivision is enforceable, we point out that there is a corollary to that proposition which affords protection and due process of law to a purchaser of a lot in the subdivision, namely, that a refusal to approve plans must be reasonable and made in good faith and must not be arbitrary or capricious.

*Id.* at 9, 449 P.2d at 362–63.

Other jurisdictions have likewise upheld covenants that do not contain objective standards or guidelines as long as the approving authority acts reasonably. *See* Restatement (Third) of Property: Servitudes § 6.9, at 179–80 (2000) (collecting cases); Stacey Rogers Griffin, Annotation, *Validity and Construction of Restrictive Covenant Requiring Lot Owner to Obtain Approval of Plans for Construction or Renovation,* 115 A.L.R. 5th 251 (2004) ("The majority view with respect to covenants requiring submission of plans and prior consent to construction by the developer ... is that such clauses, even if vesting the approving authority with broad discretionary powers, are valid and enforceable so long as the authority to consent is exercised reasonably and in good faith."); *see*

*also Melson v. Guilfoy,* 595 S.W.2d 404, 407 (Mo.Ct.App.1980) (upholding injunction to remove a fence not previously approved by an architectural control committee).

The covenants at issue here establish general architectural standards:

> Architectural standards are established to the end that the Subdivision may benefit from the natural advantages of its particular location. While the standards for architectural style are flexible, compatibility with the informal natural environment is required. Contemporary, Southwestern and Western styles typical of the Pikes Peak Region are desirable. Formal styles such as French Provincial, English Tudor, and Colonial will not be approved except in modified forms. All buildings must be designed to fit the natural contours of the lot without excessive grading.

They also specifically address fences:

> Fencing shall be limited to privacy areas and animal control areas adjoining the primary dwelling. Fencing along lot lines is not desirable. All fences and walls shall be designed and constructed as a visual extension of the architecture of the primary dwelling, including both scale and use of materials. The painted, stained or natural coloration of fences shall be consistent with the coloration of the primary dwelling. The finished side of fences shall face the exterior of the home. No fence shall be installed without the proper written consent of [d]eclarant.

Both covenants appear in Article 1, which is entitled, "Covenants to Preserve the Residential Character of the Subdivision."

The covenant addressing fencing contains general language similar to the language of the covenant the supreme court analyzed in *Rhue.* Following *Rhue's* guidance, we conclude that the intention of the covenants here is to protect present and future property values of the subdivision by "benefit[ing] from the natural advantages of its particular location." To accomplish this result, the covenants provide some flexibility in the placement and construction of fences, while preserving the association's ability to regulate them. *See Buick,* 21 P.3d at 863 (enforcing a covenant that "grant[s] the [homeowners as-

sociation] broad latitude in making aesthetic decisions with respect to every type of improvement on the property"); *but see Allen v. Reed,* 155 P.3d 443, 445–46 (Colo.App.2006) (finding "the height of any dwelling house shall not exceed one story" to be ambiguous and unenforceable; not citing *Rhue* ).

██ Thus, we conclude that the covenants here should be upheld "against the contention that they lacked specific restrictions providing a framework within which the architectural committee must act" as long as the "refusal to approve plans [was] reasonable and made in good faith and ... not ... arbitrary or capricious." *See Rhue,* 168 Colo. at 9, 449 P.2d at 362–63; *see also Woodward v. Bd. of Dirs. of Tamarron Ass'n of Condo. Owners, Inc.,* 155 P.3d 621, 624 (Colo.App.2007). The determination of whether a homeowners association has acted reasonably or arbitrarily is a question of fact. *Woodward,* 155 P.3d at 625.

██ The trial court's order does not mention *Rhue* or apply its principles. Rather, it only states that "the covenants regarding fencing are vague." Therefore, we conclude that (1) the trial court did not apply the proper test to resolve this issue; (2) we must reverse the determination that the covenants are vague because they do not contain specific standards concerning fencing; and (3) we must remand this case to the trial court for a determination, under *Rhue* and *Woodward,* of the question of fact of whether the association acted reasonably when it denied the homeowners' plan. *See Norris v. Phillips,* 626 P.2d 717, 719 (Colo.App.1980)("[T]he trial court's determination of a breach of covenant, without a determination that the architectural control committee acted unreasonably or in bad faith, was error.").

## VI. Conclusion

We reverse the judgment for the homeowners entered by the trial court in this case. We conclude that the association provided the homeowners with notice of its decision to deny the plan within thirty days of when the plan was delivered to the association. We remand to the trial court for further proceed-

ings to determine whether the association acted reasonably in denying the plan.

Thus, the trial court's decision to award the homeowners attorney fees must also be reversed. *See Rossman v. Seasons at Tiara Rado Assocs.*, 943 P.2d 34, 38 (Colo.App. 1996). On remand, the trial court shall, based upon its resolution of the question of whether the association acted reasonably, award fees and costs to the prevailing party. *See* § 38–33.3–123(1)(c), C.R.S.2008 ("In any civil action to enforce or defend the provisions of ... the declaration ... the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party."); *see also BA Mortgage, LLC v. Quail Creek Condo. Ass'n*, 192 P.3d 447, 453 (Colo. App.2008).

The judgment, including the award of attorney fees, is reversed. The case is remanded to the trial court for further proceedings consistent with the directions contained in this opinion.

Judge TAUBMAN and Judge PLANK* concur.