978 So.2d 598 (2008)
Martha Melinda Jones KLEBANOFF and Carla Louise Jones, Plaintiffs-Appellees,
v.
Fred Jackson HABERLE, Aber Oil and Gas Co., Christopher Trust, through Charles Williams, Trustee, and Thomas C. Broome, Defendants-Appellants.
No. 43,102-CA.
Court of Appeal of Louisiana, Second Circuit.
March 19, 2008.
*599 Blanchard, Walker, O'Quin Roberts by Paul M. Adkins, Scott R. Wolf, W. Timothy Allen, Shreveport, for Appellants.
L. Havard Scott, III, for Appellees.
Before WILLIAMS, DREW and MOORE, JJ.
MOORE, J.
The defendants, Christopher Phillips, the Christopher Trust and Fred Jackson Haberle, appeal a judgment finding that they agreed, through an exchange of emails with the plaintiffs' attorney, to compromise a lawsuit in which the plaintiffs, Martha Melinda Jones Klebanoff and Carla Louise Jones, sought a declaration that they owned an undivided interest in a mineral lease. The judgment ordered the defendants to execute the compromise whereby they transferred their interest in the lease to the plaintiffs for $56,136.10 and a waiver of any future claims. We affirm.

Factual Background
The plaintiffs are two daughters of Carl Jones, who as a lessee executed a mineral lease in 1975 referred to as "the Yarber Lease." Carl Jones's other daughter, Caroline J. Broome, is the plaintiffs' half-sister and mother of one of the defendants, Christopher Phillips. According to the plaintiffs, Carl Jones died in 1999, but his most significant and valuable asset, the Yarber Lease, was not included in his succession. The plaintiffs also asserted that their father's will left each daughter an equal share of his estate, with an overriding royalty to Phillips's grandmother, Carolyn H. Jones, but all revenues from the Yarber Lease were being paid to Thomas Broome (Caroline Broome's husband and Phillips's stepfather), Aber Oil & *600 Gas (Phillips's company), Fred Jackson Haberle (Phillips's business partner), and the Christopher Trust (set up by Phillips).
The plaintiffs retained counsel, L. Havard Scott, who sent demand letters to these people and entities, demanding that they return the Yarber Lease to Carl Jones's succession and to Mrs. Jones. The Broomes immediately complied, but the other parties refused.
In November 2005, the plaintiffs filed the instant suit seeking a declaratory judgment recognizing them as undivided owners of the Yarber Lease, with an accounting and payment of royalties. Phillips was not named a defendant in the original petition.
What then ensued was an exchange of emails between the plaintiffs' lawyer, Havard Scott, and Christopher Phillips, some 32 of them from January 27 to April 13, 2006. These were admitted at trial as Exhibits J-10 through J-42. According to the plaintiffs, on February 8, they reached an agreement with Phillips whereby the defendants would assign their entire interest in the Yarber Lease to the plaintiffs for $56,136.10, to be paid within two weeks, and a release from any further claims. The plaintiffs drafted an assignment and tendered it with the money on February 24, but the defendants refused to accept.
The plaintiffs filed the instant amended petition in April 2006, adding Phillips as a defendant and demanding enforcement of the compromise reached on February 8. Ultimately, they dismissed Aber Oil & Gas and dropped all claims except to enforce the compromise.
The matter proceeded to a bench trial in January 2007. The parties stipulated that Phillips had the authority to act on behalf of the other two defendants, the Christopher Trust and Fred Haberle, and that the Louisiana Uniform Electronic Transactions Act, specifically La. R.S. 9:2607, applied to the case.[1] Phillips testified that there was no meeting of the minds between himself and the plaintiffs' attorney, only a "starting point to deal." He also testified that his main concern was to get a full and complete release, but he did not feel the document forwarded to him gave him this. He expected his own attorney to draft a "global release," but for various reasons this never happened.

Action of the District Court
The court ruled orally that the parties reached a compromise on February 8, 2006 (Exhibit J-18), in that they reached a meeting of minds as to what was being conveyed and how much it would cost. Further, Phillips asked his own lawyer to draft a settlement, but he failed to do so, and then Phillips was "spooked" by some terminology in the one sent by the plaintiffs. As in a sale, however, a dispute over the wording of the contract would not make it unenforceable. Finally, under R.S. 9:2607, the emails satisfied the writing requirement for a compromise, La. C.C. art. 3072.
The court rendered judgment finding an enforceable compromise, placing the plaintiffs in possession of the defendants' interest in the Yarber Lease, and ordering the *601 plaintiffs to deliver a release and $56,136.10 to the defendants. The court denied the defendants' motion for new trial, and this appeal followed.

Discussion: Standard of Review
As a preliminary matter, the defendants urge that the proper standard of review is de novo, not manifest error, because of legal error that interdicted the fact-finding process. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. Specifically, they contend that the elements of a compromise were not present, thus tainting the court's findings as a matter of law. Slaughter v. Arco Chemical Co., XXXX-XXXX (La.App. 4 Cir. 4/26/06), 931 So.2d 387.
The plaintiffs respond that the usual standard of review, manifest error, applies to cases involving disputes over the existence of a compromise agreement. Sceroler v. Rancher, 1999-2859 (La.App. 1 Cir. 2/15/02), 808 So.2d 803, writ denied, XXXX-XXXX (La.5/24/02), 816 So.2d 849. We agree.
The trial court's interpretation of an alleged compromise agreement is subject to manifest error/clearly wrong review. Kelly v. Owens, 29,613 (La.App. 2 Cir. 8/20/97), 698 So.2d 757, writ denied, 97-2311 (La.12/12/97), 704 So.2d 1193; Doyal v. Pickett, 25,247 (La.App. 2 Cir. 12/1/93), 628 So.2d 184; Sceroler v. Rancher, supra. This is because the existence or validity of a compromise depends on a finding of the parties' intent, an inherently factual finding. Kelly v. Owens, supra. For the reasons discussed below, we find no legal error of any kind that would interdict the district court's fact-finding process. This argument lacks merit.

Existence of Compromise
By their first assignment of error, the defendants urge the court erred in finding they entered a compromise. Under C.C. art. 3072, a compromise must be in writing, and the writing must be "unambiguous, perfect and complete in itself." Parich v. State Farm, 919 F.2d 906 (5 Cir.1990). The emails addressed all aspects of the agreement, but the plaintiffs' counsel repeatedly referred to their "deal" as though it were finalized. In the crucial emails of February 8, Scott felt there was a deal, but within an hour Phillips retorted, "What deal do we have?" Then, in a February 15 email, Scott admitted exploring "alternative resolutions of this situation," and on February 16 cited "the problem we have with consideration of the so called `original deal'"; from these, the defendants contend that even Scott doubted they had really reached a compromise. They submit that back-and-forth correspondence between the parties does not necessarily form a compromise. Sceroler v. Rancher, supra; Anthony v. Liberty Mutual Ins. Co., 99-1730 (La.App. 3 Cir. 4/5/00), 759 So.2d 910. In addition, disagreement over indemnity is fatal to a compromise. Collins v. Mike's Trucking Co., XXXX-XXXX (La.App. 1 Cir. 5/5/06), 934 So.2d 827, writ denied, XXXX-XXXX (La.12/8/06), 943 So.2d 1094. Further, it was error for the court to apply the principles of sale, La. C.C. art. 2439, by analogy to the much more complicated requirements of a compromise, C.C. art. 3071. Finally, they argue the parties did not intend to be bound until a certain form of contract was executed, under La. C.C. art. 1947; since the assignment was never perfected, there was no enforceable agreement. Knipmeyer v. Diocese of Alexandria, 492 So.2d 550 (La.App. 3 Cir.), writ denied, 496 So.2d 347 (1986).
The plaintiffs respond that the only essential elements of a compromise are a mutual intent to end the litigation and reciprocal concessions to adjust their differences. La. C.C. art. 3071. A valid *602 compromise may result when two instruments, read together, outline the parties' obligations and show their acquiescence in the agreement. Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981). Moreover, they contend, the defendants' stipulation that the La. Uniform Electronic Transactions Act applied waived any claim that emails are not really writings.
At the time of these events, La. C.C. art. 3071 provided:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.[2]
There are two essential elements of a compromise: (1) mutual intention of preventing or putting an end to the litigation, and (2) reciprocal concessions of the parties to adjust their differences. Trahan v. Coca Cola Bottling Co., XXXX-XXXX (La.3/2/05), 894 So.2d 1096. The requirement that the agreement be in writing does not necessarily mean that the agreement must be contained in one document. Felder v. Georgia Pacific Corp., supra. Where two instruments, read together, outline the obligations each party has to the other and evidence each party's acquiescence in the agreement, a written compromise agreement has been perfected. Id.; Townsend v. Square, 94-0758 (La. App. 4 Cir. 9/29/94), 643 So.2d 787. Compromises are favored in the law, and the burden of proving the invalidity of such an agreement lies with the party attacking it. Rivett v. State Farm, 508 So.2d 1356 (La. 1987); Kelly v. Owens, supra.
The crucial issue is the parties' intent as expressed in the emails. What follows is a summary of their communications.
In his first message, February 1, Phillips told Scott, "If you want you can just propose [the plaintiffs] pay me for what I have in the deal and I will convey my interest to them." Scott replied on February 2 that this would be acceptable to his clients: "We agree to this proposal of settlement." Several days later, Phillips clarified his offer by demanding payment in full: "I will not finance their interest[.] Aber Oil & Gas and myself would expect to be paid for what we have invested at which point we would convey the interest over." On February 8, Scott tentatively accepted this offer, but:
Now it seems as if the only issue that we do not have a complete meeting of the minds with respect to is how much investment is involved, how much your aunts will "finance" this transaction/compromise and how much time you will allow them to do it.
He requested proof of how much the defendants had invested in the current project, the Frierson 30-3 well; he also commented, perhaps gratuitously, that the plaintiffs had been "coerced" into signing over their interest in the Yarber Lease in 2000. Phillips immediately replied that thanks to that statement, "I will no longer *603 try to work with you, your clients can either pay the $56,136.10 in two weeks or I will have my attorney contact you." He reiterated that he could not finance the plaintiffs' payment: "Please let me know how you would like to proceed."
Scott responded that he was "thrown for a loop" by the request for up-front money instead of a payout from the lease. "Nevertheless, subject to working out the financing aspect, we have a compromise. I will do what I can to scrounge up some financing for Carla and Melinda." Phillips replied (Exhibit J-18):
If I don't receive the money before the logging of the 30-3 the deal is off and you will have to resume litigation. * * * Expect a letter outlining our conversations and my proposal from my attorney. I will have [the accountant] include the information you requested below.
Scott responded, "I am pleased that we have a deal. * * * I look forward to hearing from your attorney so that we can get this matter concluded." Almost immediately, however, Phillips asked, "What deal do we have? The 33% back in after payout or the payment of the remainder of the un-recovered funds before logging the Frierson 30-3."
A week later, Scott asked Phillips why he had not received the paperwork "to close our settlement of a return assignment of yours and Haberle's interest in the Yarber lease for the unrecovered amount of $56,000," and again requested documentation of production payments and the identity of the payee. Apparently wavering, Phillips replied, "The 33 percent back-in after payout is the current structure. * * * However, I would rather just get the money I have in it back and move on." He again offered to send "detailed financials concerning what has been spent and recouped. We can make the deal effective Feb. 1 and any additional funds received will be forwarded to your clients."
On February 22, Scott advised Phillips that the money was in his trust account, ready to be transferred, but he had not yet received the assignment from the defendants' lawyer as promised. Later the same day, he emailed his own proposed assignment as an attachment. Phillips responded that he had "several problems" with Scott's assignment; mainly, it contained no indemnification from future claims by the plaintiffs or any kind of warranty. Scott replied that he would provide a "general release for you," and the assurance that his clients' funds would not be disbursed until the assignment was signed. Phillips agreed: "No problem on not disbursing until the assignment is completed. I would rather have my attorney draw up the assignment."
After some delay and receiving nothing from Phillips, Scott wrote on March 7, and again on March 17, asking for the detailed financials by the end of the next week "or else you will leave me with no choice but to request the court's involvement." Phillips replied with some financial information but added, "I do not feel comfortable assigning this to you. How will I be assured of indemnification of future claims concerning the Carl Jones Estate from Carla and Melinda?" Scott promptly advised that assigning it to him was merely an accommodation to his clients, and he intended to provide a "complete and comprehensive release." Again hearing nothing from Phillips, on March 28 Scott forwarded another proposed assignment; however, it omitted the requested indemnification or hold-harmless clause.
On April 5, Scott faxed a conventional letter to Phillips advising that he had filed the amended petition to enforce the compromise. Phillips replied by email, over a week later, that the proposed assignment *604 was "very generic and included no release." Further, "I am tired of dealing with you and your slanderous comments. * * * Once the lawsuit has been served I will forward it on to [my attorney] and all future correspondence should by-pass me and be directed toward him." Scott responded that his clients had always been agreeable to the general release, which they expected Phillips's attorney to provide, but that he (Scott) would respect his request and communicate only through counsel. This was the final email.
As this synopsis shows, on at least three occasions (February 1, 7 and 8), Phillips offered to settle the lawsuit for "what I have in the deal," "what we have invested," and "$56,136.10 in two weeks." Scott accepted, subject to financing, and Phillips confirmed, "If I don't receive the money before the logging of the 30-3 the deal is off." In our view, this exchange satisfied the two essential elements of the compromise: a mutual intent to end the litigation and reciprocal concessions. Trahan v. Coca Cola Bottling Co., supra. The district court was not plainly wrong in so finding.
Admittedly, Phillips's subsequent emails contained isolated remarks which, taken out of context, might cast doubt on the compromise, as when he asked on February 8, "What deal do we have?" However, this potential issue appears resolved by the remainder of that email, and by the one of February 16, when Phillips stated, "I would rather just get the money I have in it back and move on." In our view, this suggests reservations about the commitment he previously made, but it does not alter the showing of consent and mutual concessions reached on February 8.
The remainder of the emails show some difficulty in incidental matters. Phillips was reluctant to make an assignment in favor of the plaintiffs' attorney, but Scott's responses show this was merely a concession to his clients, who would be the true parties in interest. Next, there was something of an impasse as each side apparently expected the other to furnish the assignment; the plaintiffs provided two drafts, both of which omitted the indemnification on which Phillips insisted. However, Scott repeatedly assured Phillips that the plaintiffs would indeed sign whatever indemnification he wished. This does not rise to the level of disagreement that was fatal to the compromise in Collins v. Mike's Trucking Co., supra. On February 16, Scott mentioned "alternative resolution" of the situation, but in context this is an obvious reference to judicial enforcement of the compromise. Neither these incidental issues, nor the district court's fleeting analogy to a contract of sale, alter the essential finding of a compromise.
Finally, the defendants urge that the parties contemplated the preparation of additional documents, or placing the compromise agreement into a certain form; in such a situation, the law presumes they did not intend to be bound until a contract was executed in that form. In support, they cite La. C.C. art.1947:
When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form.
The argument, however, is unpersuasive. Phillips stated on February 24, "I would rather have my attorney draw up the assignment"; on several occasions Scott said he was awaiting that document, but it never came. Phillips promised to provide it; he never delivered. Any failure to execute an assignment lies squarely with Phillips, and is a deficiency he cannot claim to his benefit under the guise of Art.1947.
The jurisprudence cited by the defendants is also inapposite. In Knipmeyer v. *605 Diocese of Alexandria, supra, the court refused to interpret a survey form or letter of intent as a contract of employment, which was usually expressed by a standard-form contract. In Breaux Bros. Const. Co. v. Associated Contractors Inc., 226 La. 720, 77 So.2d 17 (1954), the court refused to enforce an oral contract for earth removal. In addition to finding no evidence that the parties agreed on a price, the court added that the parties obviously agreed that the contract should be reduced to writing, in the absence of which there was no contract. In the instant case, the parties' positions were clearly expressed in writings which are recognized under the La. Uniform Electronic Transactions Act, La. R.S. 9:2607. The object of their communications was never anything other than a compromise. We find no presumption of an intent not to be bound until the execution of a contract in a special form.
This assignment of error lacks merit.

Admission of Parol Evidence
By their second assignment, the defendants urge the court erred in admitting the testimony of Christopher Phillips. Parol evidence is inadmissible to prove the existence of a settlement agreement. Collins v. Mike's Trucking Co., supra. The fact that the court felt the need to listen to testimony only underscores that the emails did not prove a compromise.
The plaintiffs respond that the court did not really consider Phillips's testimony; it found a compromise strictly within the four corners of the emails. Moreover, Phillips's testimony was against his own interest and thus admissible under EM Nominee Partnership v. Arkla Energy Resources, 26,795 (La.App. 2 Cir. 5/12/95), 656 So.2d 55, writ denied, 95-1792 (La.1/5/96), 666 So.2d 300. We agree.
The lengthy synopsis of the emails shows the contours of the parties' negotiations: what each side wanted, which avenues they rejected and, finally, the terms they agreed to. The entire agreement is apparent from the communications. Phillips's testimony did not taint the ultimate finding of a compromise.
A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express. La. C.C. art. 3076.[3] The intent which the words of the compromise instrument express in light of the circumstances at the time of the execution of the agreement is controlling. Robinson v. Robinson, 99-3097 (La. 1/17/01), p. 18, 778 So.2d 1105, at 1122. Phillips's testimony corroborated that he wanted to settle the lawsuit for an amount equal to his investment in the Frierson 30-3 and full indemnity. It also established that when the well turned out to be productive, the plaintiffs' undivided interest was worth much more than his $56,136.10 investment. The fact that the deal turned out to be unfavorable to the defendants is no basis for denying that the deal was ever struck. Phillips's testimony surely illuminated the circumstances surrounding the compromise, but did not amount to improper parol evidence. This assignment of error lacks merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Appellate costs are to be paid by the defendants, Christopher Phillips, the Christopher Trust and Fred Jackson Haberle.
AFFIRMED.
NOTES
[1] "§ 2607. Legal recognition of electronic records, electronic signatures, and electronic contracts.

"A. A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.
"B. A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.
"C. If a law requires a record to be in writing, an electronic record satisfies the law.
"D. If a law requires a signature, an electronic signature satisfies the law."
[2] This article was amended by 2007 La. Acts. No. 138, effective August 15, 2007, and its substance incorporated into current articles 3071 and 3072. According to the revision comments, the amendment was not intended to change the law.
[3] The substance of the current Art. 3076, which took effect August 15, 2007, was previously part of Art. 3073. The 2007 amendment was not intended to change the law.