McDonald, j.
IsThis is an appeal from a judgment granting a motion to enforce a settlement agreement in a property partition suit. For the following reasons, the judgment is affirmed. •
FACTS AND PROCEDURAL BACKGROUND
This matter began as a suit for partition of about 200 acres of property in the northern part of East Baton Rouge Parish filed in May 2005. At the time the suit was filed, approximately 26 people and entities co-owned the property in indivisión. The property lies next to a Superfund site formerly operated by Petro Processors of Louisiana, Inc. as an industrial waste disposal facility. The site has been the subject of federal court proceedings, and the U.S. Environmental Protection Agency and the Louisiana Department of Environmental Quality maintain oversight over the remediation of the property. The appellee in this appeal, NPC Services, Inc., was created to assume responsibility for the remediation of that Superfund site. NPC is owned in part by entities responsible for contamination of the site.
The appellant, Leopold Weill, III, (known as Jay Weill and hereafter referred to as Weill) inherited a .0375 interest in the property and had extremely limited involvement in it. He had never walked on the property and had only viewed it partially from U.S. Highway 61, which runs through the property in a north-south direction. Weill was one of several co-owners that initiated a suit against NPC for damages caused by contamination migrating onto the property from the NPC site. In the original partition suit, Weill was one of 16 defendants that included NPC, which owned a .00417 interest in the property. During the course of the litigation, NPC purchased the interests of co-owners who owned more substantial interests in the property. In June 2006, NPC petitioned the court for a public auction by the Sheriff of East Baton Rouge Parish to effect a partition bby licitation. In August 2006, a joint motion to substitute parties was filed with the court by NPC and a number of the original defendants, referred to as “trans-ferors.” The motion recited that the transferors, former owners of the subject property, had sold their interest in the property to NPC, and alleged that NPC should be substituted as the proper party in the action. NPC was substituted as the proper party for the majority of the original defendants by order of the court signed October 25, 2006.
The partition suit was scheduled for a two-day bench trial commencing on August 9, 2007, with pre-trial briefs ordered for July 20, 2007. According to joint stipulations submitted prior to the trial, NPC owned 40% of the subject property. The owner of the second largest interest in the property, 15%, was Wright Investments, *405 L.L.C. A pre-trial brief was submitted by the “Wright Group,” comprised of Wright Investments, L.L.C. and the remaining original plaintiffs, arguing that because the property at issue was contaminated it could not be partitioned, and the trial should be stayed until the contamination had been remediated. The pre-trial brief of Weill adopted the argument of the Wright Group, and submitted that the court should stay the proceedings pending resolution of the contamination and remediation issues.
Settlement negotiations were ongoing prior to the trial. By letter of July 6, 2007, counsel for NPC advised attorneys representing the remaining co-owners and Jeanne Weill Amend, Weills’ sister who was not represented by counsel, that NPC remained interested in acquiring the property on a voluntary basis without the need for a partition sale. The letter stated that “We are now at a point where NPC will soon incur significant attorney and expert fees in preparing this matter for trial. Before incurring these fees, NPC wishes to make this final offer to purchase the remaining, collective interests in the property.” Revoking any outstanding offers to purchase, the letter set forth the terms and conditions under which NPC |5was offering to purchase the property; the offer expired at 5:00 PM CST on July 16, 2007. The purchase price of $1,140,000.00, which was to be distributed proportionate to the owner’s interest, including NPC, was derived from an appraisal of the property as if it had no contamination, commissioned by members of the family owning the tract. The sellers/co-owners were required to warrant that neither they nor anyone acting on their behalf deposited or permitted the deposit of any “hazardous substance” as that term is defined by environmental law. NPC agreed to indemnify the sellers/co-owners for any remediation costs that they may incur due to any claims for remediation of the property that may be asserted against them due to their status as former “owners” of the property “to the extent that any such claims for remediation costs arise out of the presence of any hazardous substances on the property that originated from the former Petro Processors of Louisiana, Inc. site and are subject to the federal Consent Decree.” Terms relative to taxes, mineral rights, and settlement of pending litigation for damages against NPC were also offered.
On July 20, 2007, NPC’s expired offer to purchase was resubmitted with a purchase price of $1,090,000.00; all other terms other than price “to remain the same as those set forth in our July 6, 2007 letter.” This offer expired on July 25, 2007 at 5:00 p.m. At 5:39 p.m. on July 24, 2007, counsel representing NPC faxed a letter confirming its understanding of “the latest settlement offer you made to me this afternoon. You agreed to settle all claims, including those made in both the damage suit and the partition suit, by selling all of the remaining interest in the property at issue (48.75%) for a total price to the remaining owners (those represented by Frank, Mickey, Dawn and Jeanne Amend) of [$]655,~ 750. In addition, your clients would reserve their minerals (to the extent they currently own minerals) and we would agree in writing to defend, indemnify and hold your clients harmless from any future claims against them for contamination of the | f,property caused by or related to the Petro Processors site.” The communication asked for confirmation that this was the offer. At 4:37 p.m. on July 26, 2007, counsel for Weill communicated with NPC counsel as follows:
Gene: I have discussed the matter with my client and with Dawn and Frank. I am authorized to accept your offer on behalf of Jay Weill, as follows: Jay will accept his 3.75% of the $555,750 you *406 offered, with his share of the $24,250 to be delivered to Frank Elliot for the payment of expenses. In addition, the contract will provide that NPC will provide an indemnity and hold harmless agreement as to the property and any future actions. Further, the contract will provide that 3.75% of the minerals will be reserved to Jay Weill. Lastly, the contract will provide that NPC pays all court costs. Of course, we will reserve the right to have the deed and contract be subject to our approval. Thanks. We look forward to closing the deal. Mickey
On July 27, 2007, NPC notified the trial court that it had settled with all the remaining parties and co-owners, and advised that the matter could be taken off the docket. A copy of an e-mail to the court, confirming a telephone call made earlier to report the same information, was sent to counsel for the parties “who had not previously settled but with whom we now have an agreement.”
Throughout the rest of the year, documents memorializing the agreement were drafted, edited, and circulated among the parties’ counsel. On December 28, 2007, a letter was sent to counsel representing the remaining co-owners, including Weill and Jeanne Amend, enclosing the documents to be executed to complete the sale of the property. In January 2008, an issue was raised by Weill regarding the extent of the indemnification, and he subsequently refused to complete the transaction. With the exception of Weill’s 3.75% interest in the property, NPC is now the sole owner.
In March 2008, NPC filed a motion and order to enforce settlement agreement in the trial court, and also, in the alternative, a motion for partial summary judgment. A motion and order for summary judgment, and in the alternative, a motion to set minimum price for sale was filed by Weill. The matter was heard on April 28, 2008. It was agreed by the parties that if the motion to |7enforce was granted the other matters were moot; therefore, testimony on that issue was elicited first. At the conclusion of the testimony and argument of counsel, the trial court gave oral reasons and rendered judgment granting the motion to enforce settlement filed by NPC. It is this judgment that is before us on appeal.
Weill raises five issues, assigned as error, on appeal:
(1) Whether the trial court erred in finding that a compromise had been confected between NPC Services, Inc. and Leopold Weill, III based upon correspondence between their counsel where Mr. Weill had never given express, written consent to his attorney to bind Mr. Weill to a settlement.
(2) Whether the trial court erred in finding that a compromise had been confected between NPC Services, Inc. and Leopold Weill, III based upon correspondence between their counsel where no written settlement agreement signed by the parties exists.
(3) Whether the trial court erred in finding that a compromise had been confected between NPC Services, Inc. and Leopold Weill, III based upon correspondence between their counsel where the correspondence of the attorneys contained terms that were not agreed upon, including terms regarding the scope of indemnity.
(4) Whether the trial court erred in ordering Mr. Weill to execute the documents attached as Ex. F to the Affidavit of Eugene Groves attached to NPC’s Motion to Enforce Settlement Agreement where the scope of *407 those documents exceed that of the correspondence of July 25 and 26, 2007 between counsel for NPC Services, Inc. and Mr. Weill and contains provisions that are prejudicial to Mr. Weill’s rights.
(5) Whether the trial court erred in ordering Mr. Weill to execute the documents attached as Ex. F to the Affidavit of Eugene Groves attached to NPC’s Motion to Enforce Settlement Agreement where Mr. Mang-ham’s email of July 26, 2007 states that Mr. Weill reserves the right to have any settlement deed and contract be subject to his approval, but Mr. Weill never approved the documents the trial court has ordered him to sign.
LAW AND ANALYSIS
Weill contends that the trial court committed both errors of law and errors of fact that require a reversal of its judgment. Appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. On legal issues, the appellate court gives no special weight to the findings of the trial court, | sbut exercises its constitutional duty to review questions of law. Pierce v. State Office of the Legislative Auditor, 07-0230 (La.App. 1 Cir. 2/8/08), 984 So.2d 61, 67, writ denied, 08-0542 (La.4/25/08), 978 So.2d 369. A legal error occurs when a trial court applies an incorrect principle of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735.
The two-part test for the appellate review of a factual finding is 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. If a reasonable factual basis exists, an appellate court may set aside a trial court’s factual finding only if, after reviewing the record in its entirety, it determines the trial court’s finding was clearly wrong. Pierce, 984 So.2d at 67. Mixed questions of law and fact are also subject to the manifest error standard of review. Brasseaux v. Town of Mamou, 99-1584 (La.1/19/00), 752 So.2d 815, 820.
A settlement agreement, or compromise, is a nominate contract subject to the civil code rules pertaining to contracts. La. C.C. art.1914; La. C.C. art.1915. Louisiana Civil Code articles 3071 and 3072 provide specific rules regarding a compromise and its formal requirements. In July 2007, both these rules were contained in article 3071 and provided:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
hWeill correctly notes that a settlement agreement may be confected in only one of two ways: either by recitation in open court, or by reduction into writing. This is clear from the civil code article. However, the issue of the validity and enforceability of settlement agreements has generated considerable jurisprudence, most arising in *408 the situation we have here, where an attorney is attempting to settle a client’s lawsuit. Thus, additional rules have been established. Weill maintains that one of the requirements of an enforceable settlement agreement is that if it is in writing it must be signed by all parties, citing Sullivan v. Sullivan, 95-2122 (La.4/8/96), 671 So.2d 315, 317.
In Sullivan, the supreme court discussed compromises, reiterating some of the rules that had been established juris-prudentially. It noted that “While the statute itself does not provide for the consequences of failure to reduce a compromise agreement to writing, this Court has previously held that a compromise which is not reduced to writing is unenforceable. Bourgeois v. Franklin, 389 So.2d 358 (La.1980).” It also pointed out that the court had addressed the writing requirement in Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981) and stated therein:
The Code requires that compromise agreements be in writing, by implication signed by both parties. (Emphasis in original)
The court also discussed the purposes of the rules:
As was stated in Bourgeois, supra, “La. C.C. art. 3071 is placed in the code to insure proper proof of extra-judicial agreements. Inasmuch as there is no judgment on the merits outlining the obligations each party has to the other when a case is settled by the parties, the law has seen fit to require the compromise agreement, which sets out those obligations, to be reduced to writing to serve as proof of the agreement and the acquiescence therein.” (Emphasis provided) Obviously, to serve as written proof of the agreement and obligations of both parties, and their acquiescence therein, the written agreement must be signed by both parties, obligating both to do what they have agreed on.
| ipThe court then summarized its previous discussion, stating, “it must be reduced to writing and signed by the parties or their agents.” Sullivan, 671 So.2d at 317-318 (Emphasis added)
Although the additional language “or their agents” does not appear in the earlier jurisprudence, it is there by implication. If it were necessary for the party to sign the writing that serves as proof of the agreement, often there would be no basis for enforcement, because generally the attorneys rather than the parties negotiate and contract settlement agreements. In fact, frequently the purpose of court intervention in enforcing a settlement agreement is to obtain the signature of a party who has met the contractual legal requirements but refuses to honor the agreement.
There is' also jurisprudence establishing that while attorneys are presumed to have authority to negotiate a settlement proposal for them clients, they may not enter into a binding agreement without the client’s clear and express consent. Townsend v. Square, 94-0758 (La.App. 4 Cir. 9/29/94), 643 So.2d 787, 790. Weill asserts in his first assignment of error that the trial court erred in finding a compromise because his attorney had never been “given express, written consent to bind Mr. Weill to a settlement.” There is no requirement in the law or jurisprudence that the express consent necessary to authorize an attorney to enter into a compromise be written.
Black’s Law Dictionary, Sixth Edition, defines express authority as:
That which confers power to do a particular identical thing set forth and declared exactly, plainly, and directly with well-defined limits. An authority given in direct terms, definitely and explicitly, and not left to inference or *409 implication, as distinguished from authority which is general, implied, or not directly stated or given.
Weill asserts that it was legal error for the trial court to rely on his attorney’s “apparent authority” to enter into a settlement agreement. Clearly, Weill was acting through an attorney throughout this entire matter. It is true that the attorney |ucould not enter into a binding contract without Weill’s consent. However, there is a written document wherein it is stated that the terms of the agreement have been discussed and authorized by Weill. As NPC points out, it is prohibited from communicating directly with Weill. The trial court apparently found that Weill had authorized the agreement. We agree with the trial court’s factual finding. We find no legal error by the trial court in finding that Weill’s attorney had authority to enter into an agreement in this matter because as a matter of law, the necessary authority must only be express, not written.
Ultimately, the decision before the trial court, and this court, is whether an enforceable settlement agreement existed. In addition to the specific rules discussed above, this issue is resolved by a consideration of basic contract requirements. The first step in contract law is to determine whether a contract was formed by offer and acceptance. State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443, 455. The trial court found that offer and acceptance was established by the e-mails of July 25 and 26, 2007, and that a valid, enforceable settlement agreement had been reached. The writing required to effect a compromise does not have to be contained in one document. It can be satisfied by separate writings so long as the signed offer and acceptance, when read together, outline each party’s obligations to the other and evidence each party’s acquiescence in the agreement. Felder, 405 So.2d at 522-24 (La.1981). The trial court found that it was clear what the parties intended in July at the time the agreement was made.
Weill argues, however, that the terms regarding the scope of indemnity were not agreed to. Weill testified at the hearing that he never agreed to a limited indemnity. However, it is clear from the evidence that the indemnity intended by NPC was limited to future claims “caused by or relating to the Petro Processors site.” The trial court specifically noted that up until January 16 or January 17, 2008, “all the parties keep that language in there, including Mr. Weill himself, who | i2sends a draft to his attorney, which is forwarded to NPC, which includes that term in it. Clearly, they all, including Mr. Weill, knew that that was the limitation and that was the deal.”
This court’s review of the trial court’s factual finding that Weill agreed to the indemnity provision submitted by NPC is subject to the manifest error standard. We find there is a reasonable basis in the record for the trial court’s decision and that it is not clearly wrong.
Weill further argues that the trial court erred in ordering Weill to execute documents where the scope of those documents exceed the correspondence and Weill reserved the right to have any settlement deed and contract be subject to his approval. The documents Weill was ordered to sign are those signed by the other parties to the settlement agreement, which were drafted to conform to the agreement reached in July 2007. The terms to which Weill agreed were set out in the e-mail sent by his counsel to counsel for NPC: the. amount of money that Weill would accept to sell his interest in the subject property and release any claims against *410 NPC; the indemnity and hold harmless agreement by NPC as to the property and any future actions; the reservation of mineral rights; the payment of all court costs by NPC. Those were the terms of the agreement. The e-mail does state that “we will reserve the right to have the deed and contract be subject to our approval.” The right reserved was to insure that the documents drafted accurately reflected the parties’ agreement. Documents affecting a sale of immovable property, a release of claims, an indemnity agreement, and a reservation of mineral rights will be considerably more intricate than an e-mail. Further, Weill did review, edit, and approve the documents, as evidenced by his e-mail of December 7, 2007. The only provision that Weill expresses disagreement with is an indemnity limited to claims originating from the Petro Processors site, and that issue was specifically addressed by the court.
|1sCONCLUSION
After careful consideration of the law, jurisprudence, and record in this matter, we find that the legal requirements for an enforceable settlement agreement were met. We note that the primary objective of all procedural rules should be to secure to parties the full measure of their substantive rights. It bears remembering that rules of procedure exist for the sake of substantive law and to implement substantive rights, not as an end in and of itself. Unwired Telecom Corp. v. Parish of Calcasieu, 03-0732, (La.1/19/05), 903 So.2d 392, 401; Matthews v. Horrell, 06-1973 (La.App. 1 Cir. 11/7/07), 977 So.2d 62, 75, n. 10. The procedural rules at issue here regarding writings and signatures serve to insure that there is clear proof of the obligation and the parties’ acquiescence to it. Considering the entirety of the evidence in this matter, we conclude it supports the trial court’s decision. We find no legal error on the part of the trial court, agree with its factual findings, and find no error in the results derived by its application of the law to the facts. Therefore, the judgment appealed is affirmed. Costs are assessed to Leopold Weill, III.
AFFIRMED.
PETTIGREW, J., concurs.
HUGHES, J., dissents with reasons.