# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 1, 2010

No. 09-31016

Lyle W. Cayce
Clerk

PRESTON LAW FIRM, L.L.C., successor in interest to Preston Law Firm, L.L.P.

Plaintiff-Appellee Cross-Appellant

v.

MARINER HEALTH CARE MANAGEMENT COMPANY, doing business as Mariner Health Care

Defendant-Appellant Cross-Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, DeMOSS, and DENNIS, Circuit Judges.

PER CURIAM:

This appeal arises from a dispute between Mariner Health Care (Mariner) and the Preston Law Firm (the Law Firm) over legal fees. Because a valid compromise was formed through email communications, and because the terms of the compromise clearly and explicitly provided for a permanent discount, we vacate and remand for entry of judgment in favor of Mariner.

## FACTS AND BACKGROUND

For many years, the Law Firm represented Mariner in numerous litigation matters. For the most part, they maintained a good working relationship. In

No. 09-31016

late 2004 and early 2005, Mariner fell behind on paying its legal fees[1] to several law firms, including the Law Firm.  Discussions ensued between Mariner and the Law Firm over reaching an agreement on a payment plan for approximately $2 million in legal fees owed through February 28, 2005, and for all legal fees earned thereafter.  At first, all communications attempting to resolve the payment dispute were between Paul Preston (Preston), managing partner of the Law Firm, and Devin Ehrlich (Ehrlich), general counsel for Mariner.  In March 2005, Roslyn Lemmon (Lemmon), another partner at the Law Firm, took primary responsibility for negotiating payment from Mariner.

Prior to March 21, 2005, telephone discussions had taken place between Lemmon and Ehrlich.  On March 21, 2005, Lemmon sent Ehrlich an email setting forth an agreement regarding payment of the legal fees.  Ehrlich sent a reply email the same day (collectively, the March 21 Emails).  The March 21 Emails had the subject line "Payment of Bills" and read in full:

> Devin,
>
> Paul asked that I put my understanding of the proposal in writing so that we all have a clear and consistent understanding.
>
> Bills submitted through February 28, 2005 will be paid out in 12 equal monthly payments.  By way of example, if Mariner owes P&C $1.5 million in bills submitted during this time frame, monthly payments in the amount of $125,000 will be made until the bills are paid in full.  No reduction of the bills will be made.  Going forward from March 1, 2005, bills will be paid within 90 days.
>
> Please let me know if my understanding is correct.  Thanks.
>
> Roslyn
>
> [Reply by Ehrlich]

---

[1] For ease of reference, the amount in dispute is referred to as "legal fees" while the claim for fees incurred in prosecuting this case is referred to as "attorneys' fees."  In 2005, the Law Firm was named Preston & Cowan LLP, or P&C.

No. 09-31016

> We have never discussed reductions in bills, but otherwise your understanding is correct.

Pursuant to the March 21 Emails, an initial contract for payment by Mariner of legal fees was formed.

On March 24, 2005, following additional telephone discussions, Ehrlich sent Lemmon an email (the March 24 Email) setting forth an agreement with terms different from the March 21 Emails. The March 24 Email had the subject line "Fee Payment Agreement" and read in full:

> This will confirm we will pay all fees incurred as of February 28, 2005 as follows:
>
> The total will be discounted by 25 percent.
>
> • $300,000 will be paid on or before March 31
>
> • $300,000 will be paid on or before April 30
>
> • $400,000 will be paid on or before May 31
>
> • $500,000 (or whatever the true balance is) will be paid on or before June 30
>
> All fees incurred from March 1 forward will be paid on a 90 day basis.
>
> Please let me know if your understanding differs. Thanks.
>
> Devin M. Ehrlich

The installment payments totaled $1.5 million (a 25% discount on legal fees assumed to total $2 million). Each installment payment was made on time, except that the May installment (paid on May 27, 2005) was for only $300,000 with the remaining $100,000 being paid on June 10, 2005. Payments for legal fees incurred after February 28, 2005, and subject to a 90-day payment schedule were made by Mariner prior to this lawsuit, but most were several days or weeks late.

Between May 27 and May 31, 2005, several emails were exchanged between Lemmon and Ehrlich regarding the underpayment of the May

3

installment by $100,000 (the May Email Chain).  The May Email Chain had the subject line "P&C Payment" and effectively clarified that the May installment was the third scheduled installment pursuant to the terms of the March 24 Email and should have been for $400,000.  Lemmon insisted on immediate payment of the additional $100,000 and Ehrlich responded that he would "get on it right away."  The additional $100,000 was paid on June 10, 2005.

On August 9, 2005, more than one month after $1.5 million had been paid pursuant to the March 24 Email, Lemmon sent Ehrlich an email (the August 9 Email) with the subject line "Payment of Overdue P&C Bills."  The August 9 Email read in relevant part:

> Dear Devin,
>
> At some point last fall, our bills simply stopped being paid without any warning or explanation whatsoever. . . .  Long overdue bills remained unpaid notwithstanding repeated inquiries. Negotiations began and we finally and reluctantly agreed to reduce the total amount owed by 25% for all time incurred through the end of February 2005, with the further understanding that all time incurred from the end of February 2005 forward would be paid on a ninety (90) day cycle. . . .
>
> Very truly yours,
>
> Roslyn Lemmon

The next relevant communication between the Law Firm and Mariner was an email sent by Lemmon to Ehrlich on September 20, 2005 (the September 20 Email).  The September 20 Email, included in an email chain, had the subject line "RE:  Preston & Cowan Revised Proposal" and read in full:

> Devin,
>
> The timing is not great, but at some point soon, we need to reach an agreement.  With the upcoming trial dates, we need to talk about a retainer for payment.  As an additional request, we would also ask that Mariner consider paying at least a portion of the amount previously compromised.  In other words, we took $1.5 million out

No. 09-31016

of $2 million owed, and now request that Mariner consider paying the debt in full.

Thank you,

Roslyn

The final relevant communication between the Law Firm and Mariner was an email sent by Lemmon to one of Ehrlich's colleagues, copying Ehrlich, on October 27, 2005 (the October 27 Email). The October 27 Email had the subject line "P&C Fee Proposal" and read in relevant part:

Marty,

[W]e conditionally accepted a partial payment of $1.5 million on a debt of $2 million to accommodate Mariner during its merger/acquisition with SAVA. In accordance with my previous e-mail and discussions with Devin, we would ask that Mariner now consider paying the debt in full. . . .

Thanks and best regards,

Roslyn

No further communications concerning payment of legal fees occurred until the Law Firm threatened and then brought this lawsuit.

In 2008, the Law Firm filed suit in Louisiana state court under petition on open account for unpaid legal fees of $419,851.43, later corrected to $444,600.92. The Law Firm also claimed additional attorneys' fees for prosecuting its claim under LA. REV. STAT. ANN. § 9:2781(A) (2005), the Louisiana open account statute. Mariner removed to federal district court, and the Law Firm amended its complaint to add breach of contract and fraud claims.

Mariner moved for summary judgment which the district court denied in part on June 10, 2009, finding that there remained genuine issues of material fact as to the existence, validity, and breach of a compromise agreement.[2] The

---

[2] All fraud claims were dismissed pursuant to the June 10, 2009 summary judgment order and are not on appeal.

5

district court later denied cross summary judgment motions on August 13, 2009, finding again that "an issue of fact exists as to whether a compromise was reached, and an issue of fact exists as to whether the contract was modified."

A bench trial was held on September 14 and September 15, 2009. The primary evidence was the testimonies of Preston, Lemmon, and Ehrlich, and the emails exchanged between March 21 and October 27, 2005.

Preston testified that he was the managing partner at the Law Firm in 2005. He stated that he "turned over negotiations, or at least the frontline negotiations, to Roslyn Lemmon, although [he] continued to control the details of it." He explained that an "arrangement" was reached in 2005 that the Law Firm was "going to receive, over a period of time, a payment of $1.5 million as partial payment of the approximately $2 million that was owed to [it] for . . . fees through February of 2005." He claimed that the agreement was for a temporary discount and that Mariner was required to pay the balance when its cash flow problems subsided.

Lemmon testified that she was the partner at the Law Firm responsible for resolving the legal fees dispute. She stated that her "authority [to resolve the legal fees dispute with Mariner] was never at issue." She also stated that the first she heard that the discount was temporary was "in the context of this litigation" and that she understood the discount to be permanent. With respect to the September 20 Email language and the October 27 Email language requesting that Mariner consider paying the discounted fees in full, she stated that she "didn't have any legal authority to request it, but [she] thought that maybe [Mariner would] appreciate some of [the Law Firm's] efforts and compensate [it] for them."

Ehrlich testified that he was the general counsel for Mariner in 2005 and that he negotiated with the Law Firm for a permanent discount of the legal fees. He stated that, pursuant to telephone discussions and the March 21 Emails,

Mariner had offered to pay the Law Firm, and the Law Firm had accepted payment of, 100% of the legal fees earned through February 28, 2005, in twelve monthly installments. He testified that sometime between the March 21 Emails and the March 24 Email, the Law Firm decided instead to take more money up front ($1.5 million in installments) in exchange for a permanent discount of 25% on the total. He stated that he deliberately used the word "discounted" in the March 24 Email because he believed it "connotes a permanent reduction." He stated that during his "discussions with [Lemmon], at no time did we contemplate that there would be a temporary reduction. It was always contemplated that there would be a permanent reduction." He also testified that he understood the September 20 Email and October 27 Email to be attempts by Lemmon to leverage the Law Firm's bargaining position to extract payment of the discounted amount, but that it was understood that Mariner was never under any legal obligation to pay because both Mariner and the Law Firm had agreed that the discount was permanent.

On September 15, 2009, after a two-day bench trial, the district court held in favor of the Law Firm on the legal fees dispute and in favor of Mariner on the attorneys' fees question. It found that while Lemmon did have apparent authority to enter into a contract on behalf of the Law Firm, the email communications between Mariner and the Law Firm were "confused" and that any discount was "a temporary reduction at best." It also found that Lemmon's and Ehrlich's testimonies failed to "credibly reconcile" the conflicting language used in the several emails. It awarded the Law Firm $444,600.92 plus interest but denied the Law Firm additional attorneys' fees under the open account statute because the initial amount claimed ($419,851.43) was not the actual amount due. This appeal followed.

No. 09-31016

## DISCUSSION

### I.

Under Louisiana law, a principal may be bound by the acts of an agent only if the agent has "apparent authority" to bind the principal. *See* LA. CIV. CODE ANN. art. 3021 (2005); *Color Stone Int'l, Inc. v. Last Chance CDP, LLC*, 08–35 (La. App. 5 Cir. 5/27/08); 986 So. 2d 707, 713. There is no dispute in this case that Ehrlich was an agent of Mariner with the authority to negotiate and enter into a contract. The Law Firm implied through Preston's testimony, however, that Lemmon may not have had sufficient authority to enter into a contract with Mariner. The Law Firm is Lemmon's principal, not Preston.

We review the district court's factual finding that Lemmon had apparent authority for clear error. *See Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 642 (5th Cir. 2000). We hold that the district court correctly found that Lemmon had apparent authority. As confirmed by both Lemmon's and Preston's testimonies, the primary negotiations with Mariner were turned over to Lemmon. Mariner had worked closely with Lemmon for multiple years. Neither Lemmon nor any other person at the Law Firm ever stated or implied to Mariner that Lemmon lacked the authority to make decisions or enter into a contract on behalf of the Law Firm. The district court did not clearly err in finding that Lemmon had apparent authority as an agent of the Law Firm.

### II.

Mariner claims that it entered into a valid compromise with respect to the unpaid balance of legal fees earned through February 28, 2005. We agree.

Under Louisiana law, a "contract is formed by the consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." LA. CIV. CODE ANN. art. 1927 (2008). Where a writing

8

and/or a signature is required to form a contract, an email will satisfy such requirement.  *See* LA. REV. STAT. ANN. § 9:2607; *Klebanoff v. Haberle*, 43–102 (La. App. 2 Cir. 3/19/08); 978 So. 2d 598, 600–04; *Dozier v. Rhodus*, 08–1813 (La. App. 1 Cir. 6/19/09); 17 So. 3d 402, 409–10.  The March 21 Emails and the prior related telephone discussions between Lemmon and Ehrlich formed an initial contract for the payment of 100% of the legal fees.

Discussions over the payment schedule continued past March 21, 2005, however, and Mariner argues that the March 24 Email, when combined with subsequent emails, formed a valid compromise providing for a permanent 25% discount and supplanted the initial contract.  Because Louisiana law prescribes several formalities in order to form a compromise, the March 24 Email and subsequent emails must comport with such formalities, otherwise the agreement to discount the legal fees is null.  *See* LA. CIV. CODE ANN. art. 1927 (2008), 2029 (2008), & 3071 (Supp. 2010).

"A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship."  *Id*. at art. 3071.  A compromise must be made in writing and signed by both parties.  *See id*. at art. 3072 (Supp. 2010)*; Klebanoff*, 978 So. 2d at 601–02; *Dozier*, 17 So. 3d at 408–10.  As stated in *Klebanoff*,

> There are two essential elements of a compromise: (1) mutual intention of preventing or putting an end to the litigation, and (2) reciprocal concessions of the parties to adjust their differences.  The requirement that the agreement be in writing does not necessarily mean that the agreement must be contained in one document.  Where two instruments, read together, outline the obligations each party has to the other and evidence each party's acquiescence in the agreement, a written compromise agreement has been perfected.  Compromises are favored in the law, and the burden of proving the invalidity of such an agreement lies with the party attacking it.

978 So. 2d at 602 (internal citations omitted).  Louisiana law requires that we review a trial court's finding of the existence or nonexistence of a compromise under a "manifest error/clearly wrong" standard, without reference to extrinsic evidence.  *See id.* at 601 ("the existence or validity of a compromise depends on a finding of the parties' intent, an inherently factual finding"); *see also Parich v. State Farm Mut. Auto. Ins. Co.*, 919 F.2d 906, 914 (5th Cir. 1990) (a compromise must be "unambiguous, perfect, and complete in itself so that nothing is left for ascertainment by parol proof").

The first question is whether Mariner and the Law Firm have a sufficient dispute over the payment of legal fees.  The telephone discussions and the March 24 Email show there was a mutual intention of preventing further disputes or litigation over the payment of legal fees.  Mariner was trying to keep its legal representation and not get sued, and the Law Firm was trying to keep representing its largest client and keep getting paid.  Mariner's concessions were making quicker and larger payments than it otherwise felt were possible.  The Law Firm's concession was offering a 25% discount on the total amount due.  While there was no dispute as to the *amount* of legal fees owed, there certainly were reciprocal concessions to adjust the parties' differences and uncertainties over the timing and amounts of installment payments.  *See Linda Mercantile Corp. v. Bowers*, (La. App. 1 Cir. 12/22/69); 230 So. 2d 302, 305–06 (defining "dispute" broadly); *Hancock v. Lincoln Am. Life Ins. Co.*, (La. App. 1 Cir. 5/14/73); 278 So. 2d 561, 564–65 (citing *Linda Mercantile* in the context of a compromise).  We find these differences are sufficient to qualify as the subject of a compromise.

The second question is whether there were sufficient writings signed by both parties.  Emails can qualify as the signed writings needed to form contracts. LA. REV. STAT. ANN. § 9:2607; *see Klebanoff*, 978 So. 2d at 600–04; *Dozier*, 17 So. 3d at 408–10.  In this case, Ehrlich sent the March 24 Email to Lemmon.  It

qualifies as a signed writing and "outline[s] the obligations each party has to the other and evidence[s] [Mariner's] acquiescence in the agreement." *See Klebanoff*, 278 So. 2d at 602. For the compromise to be perfected, however, there needs to be at least one writing signed by Lemmon (or by another agent of the Law Firm) that evidences the Law Firm's acquiescence to the terms as set forth in the March 24 Email. In this case, the May Email Chain merely references the installment amounts and requests full payment of the May installment. It does not directly express acquiescence by the Law Firm to the terms of the March 24 Email. The August 9 Email however, when read together with the March 24 Email, provides direct evidence of the Law Firm's acquiescence to the terms of the March 24 Email. In the August 9 Email, Lemmon acknowledged that the Law Firm "finally and reluctantly agreed to reduce the total amount owed by 25% for all the time incurred through the end of February 2005." This email indicates that there was acceptance of the terms set forth in the March 24 Email; together, these emails form a valid compromise. The Law Firm's reluctance expressed in the August 9 Email does not diminish the fact that it "agreed to" and recited again the precise terms set forth in the March 24 Email. *See Klebanoff*, 978 So. 2d at 604 (stating that "reservations about the commitment . . . does not alter the showing of consent and mutual concessions"). Further, the fact that the installment payments were made before August 9, 2005, does not cast doubt on the August 9 Email's effect. Louisiana law does not require that the signed writings exist prior to any performance by one or both parties to a compromise. The March 24 Email and August 9 Email combine to form a valid compromise as a matter of law. Therefore we find that the district court clearly erred in finding that no valid compromise existed.

## III.

Because we have determine that a valid compromise exists between the parties, we now address whether the terms of the compromise are ambiguous

and thus warranted the district court's consideration of extrinsic evidence. The district court relied on extrinsic evidence to determine the intent of the parties with regard to the terms of the compromise because it found the compromise ambiguous. Mariner disputes the district court's finding that the various emails were "confused" and that the parties' agreement provided for only a temporary discount. "Under Louisiana law, the interpretation of a contract and the determination of ambiguities are questions of law." *Gebreyesus*, 204 F.3d at 642. We review the district court's factual findings concerning the parties' intent for clear error only if we determine that the terms of the compromise were ambiguous. *See id.*; *but see Klebanoff*, 978 So. 2d at 601.[3]

Louisiana law provides that where the terms of a contract are "clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046 (2008). We give the words used in a compromise their "generally prevailing meaning." *Id.* at art. 2047 (2008). As summarized in *In re Liljeberg Enters., Inc.*, "'the contract's meaning and the intent of its parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence,' such that, 'if a court finds the contract to be unambiguous, it may construe the intent from the face of the document—without considering extrinsic evidence—and enter judgment as a matter of law.'" 304 F.3d 410, 439–40 (5th Cir. 2002) (quoting *Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998)); *see also Taita Chem. Co., Ltd. v. Westlake Styrene Corp.*, 246

---

[3] It appears that Louisiana courts may apply a "manifest error/clearly wrong" standard of review not only to the *existence* of a compromise but also to the *interpretation* of a compromise. *See Klebanoff*, 978 So. 2d at 601 ("trial court's interpretation of an alleged compromise agreement is subject to manifest error/clearly wrong review"). We need not resolve this potential inconsistency with general Louisiana contract interpretation principles, however, because we hold that in this case the language of the compromise unambiguously provided for a permanent discount as a matter of law; thus, the district court clearly erred in finding the that the language of the compromise was "confused" and the intent of the parties was ambiguous.

F.3d 377, 386-87 (5th Cir. 2001). "A contract is ambiguous only if its terms are unclear or susceptible to more than one interpretation, or the intent of the parties cannot be ascertained from the language employed." *Gebreyesus*, 204 F.3d at 643. Parties may not create an ambiguity where none exists within the four corners of the contract. *See In re Liljeberg*, 304 F.3d at 440.

The March 24 Email and the August 9 Email together constitute the four corners of the compromise; from these emails we interpret the terms of the compromise. The May Email Chain, the September 20 Email, the October 27 Email, and any trial testimony or other statements by the parties constitute extrinsic evidence and can be considered only if the words used in the compromise are "ambiguous" such that we must look outside of the four corners of the compromise to determine its meaning. *See Gebreyesus*, 204 F.3d at 642.

We find that the words used in the compromise clearly and explicitly set forth the terms of the compromise. The March 24 Email provides that "all fees incurred as of February 28, 2005" will be "discounted" and that the "true balance" of the "total" will be paid "on or before June 30." The August 9 Email provides that the parties "agreed to reduce the total amount owed by 25% for all time incurred through the end of February 2005." The prevailing meaning of the word "discount" is "[a] reduction from the full or standard amount of a price or debt." *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 516 (4th ed. 2009). The word "discount" clearly meant a permanent reduction of the legal fees debt. Reading "discount" to mean a deferred payment, as the Law Firm would have us do, stretches the plain meaning of the word, and the Law Firm may not create such an ambiguity through extrinsic testimony where none otherwise exists. *See In re Liljeberg*, 304 F.3d at 440. Moreover, a permanent discount is not an absurd result. We therefore hold that the terms of the compromise are unambiguous; that is, that the parties agreed to a permanent 25% discount of legal fees. Because the terms of the compromise are clear and

explicit, the district court erred in looking to extrinsic evidence to determine the intent of the parties with regard to the meaning of the terms.

## CONCLUSION

We find that the district court did not err in denying summary judgment because a genuine issue of material fact existed as to whether Lemmon had apparent authority as an agent of the Law Firm to enter into a compromise with Mariner. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). We hold as a matter of law that Mariner and the Law Firm entered into a valid compromise pursuant to the March 24 Email and the August 9 Email and the terms of the compromise unambiguously provided for a permanent 25% discount. Therefore, we find the district court did err in considering extrinsic evidence to determine the intent of the parties and in interpreting the words used in the compromise. Because we hold in Mariner's favor on the legal fees question, we do not reach the attorneys' fees question. The judgment of the district court is REVERSED and VACATED and the case is REMANDED for entry of judgment in favor of Mariner.